Ogden PHIPPS and Lillian B. Phipps

v.

The UNITED STATES.

No. 237–67.

United States Court of Claims.

July 16, 1969.

Irving H. Bull, New York City, attorney of record, for plaintiffs. Kenneth L. MacCardle, Port Washington, N. Y., and Dunnington, Bartholow & Miller, New York City, of counsel.

Donald T. Fish, Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFFS' AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

LARAMORE, Judge.

Plaintiffs, Ogden Phipps and Lillian B. Phipps, filed joint income tax returns for the calendar years 1957 and 1958. Deficiencies were assessed and paid.[1] Plaintiffs filed timely claims for refund; the claims were disallowed, and this suit followed. The parties have agreed to a stipulation of facts. Plaintiffs have moved for summary judgment and defendant has cross-moved for summary judgment.

Throughout 1957 and 1958, Ogden Phipps (referred to as taxpayer) was a limited partner in the partnership known as Smith, Barney & Co. Plaintiffs claim that the Commissioner of Internal Revenue, acting pursuant to section 265(2)[2] of the Internal Revenue Code of 1954, improperly included in Mr. Phipps' income amounts equal to the interest paid by the partnership with respect to partnership loans secured by pledges of tax-exempt obligations that he had contributed to the partnership.

A separate issue involves the deductibility of uninsured casualty losses. During 1957, Mr. Phipps sustained an uninsured casualty loss of $19,333.33 as the result of the death of a race horse. In the 1957 return, he offset this loss against capital gain received on the sale of other horses. Also during 1957, he sustained a $400 uninsured casualty loss on the death of a farm horse. This amount was reported as an ordinary income loss, but in the deficiency assess-

1. In summary, these were:

| Year | Deficiency assessed | Interest | Date of payment |
|---|---|---|---|
| 1957 | $37,808.02 | $16,344.46 | July 12, 1965 |
| 1958 | 65,158.29 | 24,258.52 | July 12, 1965 |
| Total | 102,966.31 | 40,602.98 | |

| Year | Refund of tax claimed | Date of disallowance |
|---|---|---|
| 1957 | $36,154.42 | June 12, 1967 |
| 1958 | 50,014.99 | June 12, 1967 |
| Total | 86,169.41 | |

2. Internal Revenue Code of 1954, 26 U.S.C. § 265 (1964 Ed.):
 Sec. 265 EXPENSES AND INTEREST RELATING TO TAX-EXEMPT INCOME.
 No deduction shall be allowed for—

 * * * * * * * * * * * * *

 (2) *Interest.*—Interest on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest on which is wholly exempt from the taxes imposed by this subtitle.

ment, the Commissioner treated it as a section 1231 loss.[3]

During 1957, Mrs. Phipps sustained an uninsured casualty loss of $4,200 as a result of the death of a race horse and another uninsured loss of $6,406.25 as a result of the "breakdown" (unfit for racing) of a race horse. These were reported as capital losses. The total combined uninsured casualty losses for 1957 were $30,339.58.

During 1958, Mr. Phipps sustained uninsured casualty losses of $137,050 as the result of storm damage and $1,259.78 as the result of damage to a boat. Mrs. Phipps sustained an uninsured casualty loss of $550. These were reported as deductions from ordinary income un-

3. Internal Revenue Code of 1954, 26 U.S.C. § 1231 (1964 Ed.) provides:
SEC. 1231 [as amended by Sec. 49(a) of the Technical Amendments Act of 1958, P.L. 85-866, 72 Stat. 1606]. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.
(a) *General rule.*—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For purposes of this subsection—
(1) in determining under this subsection whether gains exceed losses, the gains described therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing taxable income, except that section 1211 shall not apply; and
(2) losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.
In the case of any property used in the trade or business and of any capital asset held for more than 6 months and held for the production of income, this subsection shall not apply to any loss, in respect of which the taxpayer is not compensated for by insurance in any amount arising from fire, storm, shipwreck, or other casualty, or from theft.
Treasury Regulations on Income Tax (1954 Code), 26 C.F.R., § 1.1231-1, provides:
Sec. 1.1231-1 *Gains and losses from the sale or exchange of certain property used in the trade or business.*

\* \* \* \* \* \* \* \* \* \* \* \* \*

(e) *Involuntary conversion*—(1) *General rule.* For purposes of section 1231, the terms "compulsory or involuntary conversion" and "involuntary conversion" of property mean the conversion of property into money or other property as a result of complete or partial destruction, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof. Losses upon the complete or partial destruction, theft, seizure, requisition or condemnation of property are treated as losses upon an involuntary conversion whether or not there is a conversion of the property into other property or money unless subparagraph (2) of this paragraph applies. For example, if a capital asset held for more than six months, with an adjusted basis of $400, but not held for the production of income, is stolen, and the loss is not compensated for by insurance or otherwise, section 1231 applies to the $400 loss.

der section 165.[4] In his deficiency assessment, the Commissioner treated these as section 1231 losses.

On the basis of our opinion in Pennsylvania Power & Light Company v. United States, Ct.Cl., 411 F.2d 1300, decided June 20, 1969, we find that plaintiffs are not entitled to recover a refund on the uninsured casualty loss issue. We also find that plaintiffs are entitled to recover on the interest deduction issue. We will consider the interest question first.

## I. Interest deduction

Mr. Phipps became a general partner in Smith, Barney & Co., a stock brokerage firm, at its formation at the close of business on December 31, 1937. As of March 31, 1956, he became a limited partner.

Mr. Phipps' initial contribution to the general partnership was $300,000 in cash. Between 1937 and 1956, his contribution was at times temporarily higher or lower in amount but it was $300,000 immediately prior to his withdrawal as a general partner.

The Articles of Partnership (as revised June 29, 1956), which converted Mr. Phipps' interest to that of a limited partner, provided for an aggregate total capital of $4,297,000, of which $3,047,000 was contributed by 23 general partners and $1,250,000 by four limited partners. As one of the limited partners, Mr. Phipps contributed $1,000,000 in agreed value securities. These securities were all issued by states, counties, cities or other political instrumentalities and are conceded to have been exempt from Federal income tax on their interest. The pertinent provision of the 1956 agreement, which explains the rights of the partnership and plaintiff with respect to the tax-exempt securities, is set forth below.[5]

The limited partners' capital contributions, including that made by Mr. Phipps, bore five percent interest per annum, plus another one percent per annum, if earned. General partners received their five percent interest on capital contributions only if earned. Mr. Phipps had an additional right to receive the tax exempt interest on the securities he had contributed. His five

4. Internal Revenue Code of 1954, 26 U.S.C. § 165 (1964 Ed.), provides:
SEC. 165 Losses.
 (a) General Rule.—
 There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise * * *.

5. See the following:

### CAPITAL

 * * * * *

The Partnership shall have the right to invest the proceeds from any maturity, redemption, or sale of such securities in similar securities which are approved by Ogden Phipps. Any securities so purchased or received through exchange and all such uninvested proceeds shall continue to be a part of the limited capital contribution of Ogden Phipps.

Upon termination of the Partnership or withdrawal from the Partnership of Ogden Phipps, there shall be returned to him, in repayment of his limited capital contribution, such part or all of the securities originally contributed by him as aforesaid as may then be on hand, the proceeds of the sale, redemption, or maturity of any securities constituting his limited capital contribution not then reinvested, and any new securities then on hand which have been purchased with such proceeds or acquired through exchange in accordance with the provisions of this Article.

If the Partnership reinvests such proceeds, or any part thereof, in securities not authorized by or in accordance with the provisions of this Article, Ogden Phipps may at his option, upon the termination of the Partnership or his withdrawal therefrom, either accept the unauthorized securities or require the Partnership to pay him an amount equal to the amount of the proceeds originally invested in such unauthorized securities, and in such latter event such unauthorized securities shall become general assets of the Partnership.

The Partnership shall have the right to pledge the securities which constitute the limited capital contribution of Ogden Phipps as collateral for a loan or loans to the Partnership and all rights of Ogden Phipps in such securities shall be subject to such right to pledge.

percent interest return, however, was reduced by an amount equal to the interest charged to the partnership to borrow capital using Mr. Phipps' securities as collateral. The Articles of Partnership provision which explains this compensation agreement is set forth below.[6]

In 1957 and 1958, Mr. Phipps was paid an amount equal to five percent of the value of his securities, as interest. From that amount, the partnership deducted the interest it had paid on loans that it made using his securities as collateral. The net amount was paid. In 1957, he was entitled to a five percent return of $48,474, less credit for interest of $28,607.14 paid by the partnership on its loans, or a net return of $19,866.87. In 1958, he was entitled to $35,998.10, less the interest paid by the partnership of $21,211.14, or a net return of $14,786.93. These amounts were paid to him. In addition, each year he received the tax-exempt interest paid by the issuers of the securities.[7]

The bookkeeping procedure which effected this agreement was described by plaintiff as follows: During the years in question, Smith, Barney & Co. made a monthly memorandum of the amount of interest it had paid on the loans. An account for "Reserve Interest on Limited Capital" was set up on its books, and at the end of each month the account was credited with the total amount of interest accrued with respect to the limited capital. This included the net amount due Mr. Phipps which the partnership calculated as $\frac{1}{12}$th of the interest on capital contributions computed at the rate of five percent per annum, less the interest paid by the firm with respect to the loans secured by its pledge of the tax-exempt securities. At the end of the year, the account was debited for the total amount due Mr. Phipps and a credit entry was made to the General Ledger account of Ogden Phipps. When earnings and profits were sufficient, the additional one percent interest was credited to his account. Shortly after the close of the year, the amount in the General Ledger account was transferred to the Customer's Ledger account of Ogden Phipps.

After an audit, the District Director of the Internal Revenue added to his income the interest expense paid by the partnership which amounts had been deducted from his five percent return: $28,607.14 for 1957 and $21,211.14 for 1958. These sums were deemed non-deductible interest paid to carry tax-exempt obligations and were considered expenses incurred by Mr. Phipps rather than by the partnership.[8]

Plaintiffs argue that section 265(2) is inapplicable because, inter alia, Mr. Phipps did not claim any deduction for interest on the indebtedness; Smith, Barney & Co. made the loans and was obligated to pay the interest; he did not guarantee the loans, nor was he personally liable for any part of the loan

6. See the following:
INTEREST ON CAPITAL
The limited capital contributions in cash shall bear interest at the rate of 5% per annum, payable quarterly during any continuance of the Partnership, to be charged to and paid by the Partnership, whether or not earned, as an expense of the business.
Ogden Phipps shall receive all coupons due or interest paid upon the securities which from time to time comprise his limited capital contribution.
In addition, Ogden Phipps shall be paid for each full year that he is a limited Partner an amount which is equal to (or for any period of less than a full year, at the rate of) 5% per annum on $1,000,000; provided, however, that the Partnership

may take as a credit against such amount the interest which it is required to pay for such period on any loan or loans secured by the securities contributed by Ogden Phipps as limited capital. * * *

7. The record is not clear whether the tax-exempt interest was paid directly to Mr. Phipps or to the partnership which in turn paid Mr. Phipps. In any event, the government has not challenged the tax-exempt status of the interest on the securities received by Mr. Phipps.

8. The record does not state whether the partnership took a deduction for the interest it paid on these loans.

and he did not participate in the negotiations for any loan. Therefore, he had no indebtedness, paid no interest, and claimed no interest deduction. Accordingly, section 265(2) is inapplicable.

We must admit that Mr. Phipps in his individual capacity neither incurred any debt, nor paid or deducted any interest. But our inquiry is not, therefore, at an end.

Recently, the Tax Court, in John E. Leslie, 50 T.C. 11 (1968), reviewed the legislative history of section 265(2). It said:

* * * The predecessor of section 265(2) first became a part of the law in the Revenue Act of 1917 (40 Stat. 300, 330, 334). The statute at that time provided that a deduction is allowed for interest paid on indebtedness "except on indebtedness incurred for the purchase of obligations or securities the interest upon which is exempt from taxation as income under this title." The Revenue Act of 1918 (40 Stat. 1066) added the words "or continued" after "indebtedness incurred."

Also in connection with the Revenue Act of 1918, the House Ways and Means Committee, stating that the statute was "difficult of administration, for in many cases it is impossible to tell for what purpose indebtedness is incurred," proposed that interest should be deductible only to the extent that it exceeded the amount of tax-exempt interest received by the taxpayer. H.Rept.No.767, 65th Cong., 3d Sess., p. 10 (1918). The Senate rejected the House proposal, and the House receded in conference. S.Rept. No.617, 65th Cong., 3d Sess., pp. 6–7 (1918); H.Rept.No.1037, 65th Cong., 3d Sess. (1919), 1939–1 C.B. (Part 2) 135. Then, in connection with the Revenue Act of 1924 and the Revenue Act of 1926, the House proposed similar amendments that would allow a deduction for interest not incurred in carrying on a trade or business only to the extent that such interest (and, in the Revenue Act of 1924, nonbusiness losses) exceeded income from tax-exempt obligations. H.Rept.No.179, 68th Cong., 1st Sess., p. 21 (1924); H.Rept.No.1, 69th Cong., 1st Sess., p. 7 (1925). The Senate again rejected the House amendments, and the House receded in the conferences, S. Rept.No.398, 68th Cong., 1st Sess., p. 24 (1924); H.Rept.No.844, 68th Cong., 1st Sess., p. 19 (1924). S.Rept.No. 52, 69th Cong., 1st Sess., p. 21 (1926); H.Rept.No.356, 69th Cong., 1st Sess., p. 21 (1926).

Finally, as a part of the Revenue Act of 1934, the House again proposed to amend the predecessor of section 265(2). * * *.

The Senate disagreed with the changes in the rules of section 265(2) and took the position that the rule of section 265(1) should not apply to tax-exempt interest. * * *. [50 T.C. at 16–17.] [9]

* * * * * *

The court then held:

* * * [P]aragraph (2) [is not] to be applied merely because the proceeds of an indebtedness are used to purchase or carry tax-exempt securities. Paragraph (2) is to be applied only when the indebtedness was incurred or continued for the purpose of purchasing or carrying the tax-exempt securities. Although we can draw these conclusions from the legislative history, there remains the question as to what circumstances warrant an inference that indebtedness is incurred or continued for the purpose of purchasing or carrying tax-exempt securities. * * * [50 T.C. at 18]

 Basically, section 265(2) prevents a taxpayer who receives tax-exempt

9. See the discussion of legislative history of this section in McCollom, "Owner of tax exempts can deduct interest on mortgage but not bank loan, says CA–7," 28 Journal of Taxation 156, 157–158.

interest income from simultaneously reducing his non-exempt income by a deduction for the interest paid on loans obtained by pledging the tax-exempt securities, *i.e.*, a double benefit. Denman v. Slayton, 282 U.S. 514, 51 S.Ct. 269, 75 L.Ed. 500 (1931); Illinois Terminal R. R. Co. v. United States, 375 F.2d 1016, 179 Ct.Cl. 674 (1967). In Denman v. Slayton, *supra*, 282 U.S. at 519, 51 S.Ct. at 270, the Court said:

> The manifest purpose of the exception in paragraph 2, § 214(a), [Revenue Act of 1921, 42 Stat. 238, 239, the predecessor of section 265] was to prevent the escape from taxation of income properly subject thereto by the purchase of exempt securities with borrowed money.

The statute requires that the indebtedness "[be] incurred or continued to purchase or carry" tax exempts. The word "to" is equivalent to the phrase "for the purpose of" and the cases have consistently held that a taxpayer who purchases tax-exempt securities with money borrowed for that legislatively prohibited purpose is not allowed to deduct his interest payments.[10] Similarly,

> * * * one who borrows to buy tax-exempts and one who borrows against tax-exempts already owned are in virtually the same economic position. Section 265(2) makes no distinction between them. [Wisconsin Cheeseman, Inc. v. United States, 388 F.2d 420, 422 (7th Cir. 1968)].

A deduction for interest paid on indebtedness incurred to carry obligations is denied if tax exempt securities are pledged to obtain capital *and* there is a direct relationship (or "nexus") between the debt incurred and the tax-exempt securities. See Illinois Terminal R. R. Co. v. United States, *supra*, and Wisconsin Cheeseman, Inc. v. United States, *supra*.

■ Underlying defendant's three alternative arguments is the basic theme that the substance of this transaction brings it within the prohibitions of section 265(2). Firstly it argues that if Mr. Phipps pledged the securities, and subsequently contributed the loan proceeds to the partnership, without question he would have been denied a deduction for the interest paid on the loan. While that may be true, it is not the case before us.

Defendant acknowledges that taxpayer did, not pay, the interest; nevertheless it argues that his return should be increased by the disallowance of the partnership's deduction for the interest paid. This position assumes that the partnership incurred the debt by pledging the tax-exempt securities and also that its interest deduction should be denied. Whether the interest expense is deductible by the partnership is not the case before us. We will assume, however, that the expense is not deductible by the partnership under section 265(2).

The key to defendant's first argument is that the interest deduction denied to the partnership should be reflected solely in plaintiff's income and not in the income of all general and limited partners because under this partnership agreement Mr. Phipps received the tax-free interest on the bonds, and by taking a credit of the partnership's interest expense against his five percent return on capital contribution, he (in effect) received the economic benefit of the otherwise non-deductible interest expense. The denial of the partnership's deduction should, therefore, be reflected by an upward adjustment of the amount of plaintiff's return from his five percent interest on capital. We note that defendant argues that the tax-exempt interest on the bond (distributed to Mr. Phipps) is partnership income and, therefore section 265(2) is applicable to the partnership.

The deductibility of the interest expense by the partnership does not affect Mr. Phipps' return. Mr. Phipps' capital

---

10. *See,* R. B. George Machinery Company, 26 BTA 594 (1932); Sioux Falls Metal Culvert Co., 26 BTA 1324 (1932) and Constance M. Bishop, 41 T.C. 154 (1963) aff'd, 342 F.2d 757 (6th Cir. 1965).

return is an expense of the business, the net amount of which is deducted from the non-exempt income of the partnership. His return is not keyed to the partnership profits, nor to the amount of interest expense which is deductible. The additional one percent return which he receives only if earned, however, will be affected by the denial of this expense deduction by the partnership. If the partnership is denied a deduction, it would absorb the full effect of that denial because its interest on capital deduction (the five percent payment) would be limited to the *net* return paid plaintiff and, in addition, its interest expense deduction would be denied. The result is that the partnership does not have the benefit of the interest expense deduction and that taxpayer receives a net amount on his capital return. The latter amount, of course, is deductible by the partnership as its expense. The interest expense deduction, if denied, would affect the entire partnership's profits by increasing its net income. It was the partnership which received the full benefit of the additional working capital obtained by the indebtedness and it should reflect any interest deduction that is denied.

Essentially, at issue is *not* whether the partnership can deduct the expense,[11] but whether plaintiff, or all partners, should bear the burden of that denial. Defendant has not explained to our satisfaction why the full brunt of the denied deduction should be reflected in plaintiff's return on his capital. It was a partnership deduction, taken for a partnership loan, made by the partnership's use of the tax-exempt securities which formed part of its capital contribution. There were 23 general partners and three other limited partners, all of whom were substantially affected by the presence of additional working capital. Assuming the partnership is denied the deduction, it should not be reflected in plaintiffs' income alone. For the above reasons, we reject defendant's first argument.

Defendant's second alternative argument is that the taxpayer should be "deemed" to have deducted interest *he paid to the partnership* on a loan to him by the partnership. Defendant constructs the following transaction: The other partners are deemed to have loaned the taxpayer funds necessary for his capital contribution in cash; plaintiff furnished the collateral which the partnership used to obtain a loan which it then loaned to plaintiff. He, in turn, contributed the cash to the partnership. By the partnership agreement, he effectively reimbursed the partnership for its interest expense. Therefore, although he did not borrow the funds from (or pay interest to) the third parties who made the loans, the arrangement was such that the credit against his five percent return was a payment of inter-

---

11. To some extent the parties are arguing whether the interest expense is deductible by the partnership. Plaintiff argues that the indebtedness was incurred to obtain working capital and not to continue to carry the tax exempts. This issue, in part, involves the problem of "nexus" or "direct relationship" between the loan and the continued holding of the securities. This issue is important when a taxpayer incurs a loan and also continues to hold or pledge the tax exempts. In this part of the case, however, we assume that the expense is not deductible by the partnership, and the issue is whether that disallowance is reflected solely in plaintiff's income. Whether, in fact, the expense is deductible, we leave for another proceeding.

In Illinois Terminal R. R. Co. v. United States, *supra*, 375 F.2d at 1021, 179 Ct.Cl. at 683, we said: " * * * It is necessary to establish a sufficiently direct relationship of the continuance of the debt for the purpose of carrying the tax-exempt bonds.

If the loan was needed to sustain plaintiff's business operation rather than its ownership of the tax-exempt securities, the prohibitory features of section 265(2) will not apply. * * * " *See also*, Wisconsin Cheeseman, Inc. v. United States, *supra*. These cases, and others like them, would be applicable in deciding the primary motivation for the partnership's activities but they are inapposite except for their general statements about section 265(2).

est within the prohibitions of section 265(2).

Plaintiff characterizes this transaction as "an involved exercise in intellectual gymnastics." There is nothing in the record to support this supposed transaction; nor is there anything to indicate that this was in fact the true arrangement among the parties. There is no indication of a loan by the partnership to him, no evidence that he furnished collateral to permit the partnership to make a loan (the proceeds of which he was to receive), no proof that he contributed cash, no indication that the partnership received interest income from Mr. Phipps and no indication that Mr. Phipps and the partnership undertook this elaborate hypothetical scheme. Were these the facts, perhaps the result would be different. The facts before us, however, cannot be manipulated into this hypothetical mold.

Thirdly, defendant argues that it is inconsistent with the legislative purpose of section 265(2) to allow one or more taxpayers to obtain a deduction which the taxpayer acting alone could not otherwise obtain and that taxpayer has used the partnership as a conduit to obtain both tax-free income and an otherwise prohibited interest deduction.

Taxpayer has not incurred any indebtedness to continue to carry his tax exempt securities, the essence of section 265(2). The loan agreement was made by the partnership for its benefit, to obtain working capital. The interest deduction, if denied, should affect the partnership's profits and all partners, proportionately. Section 265(2), in its present form, cannot be stretched to encompass the instant case. On the unique facts as stipulated before us, plaintiff is entitled to recover.

## II. Uninsured Casualty Losses— Section 1231

During 1957, plaintiffs incurred uninsured casualty losses. They offset all of these losses (except for $400 taken as an ordinary loss) against their capital gains derived from the sale or exchange of property used in their trade or business. During 1958, they sustained additional uninsured casualty losses which were reported as ordinary losses, deductible under section 165(a). The District Director treated these casualty losses as within section 1231 and required that they be offset against capital gains derived from the sale or exchange of property used in taxpayers' trade or business. Plaintiffs contend that these wholly uninsured casualty losses are not involuntary conversions of capital assets and, therefore, section 1231 is inapplicable.

Precisely the same issue was before the court in Pennsylvania Power & Light Co. v. United States, supra. In that case, taxpayer sustained uninsured casualty losses to real property and other property used in its business during 1954 and 1955. Our decision holding section 1231 applicable is controlling. On the basis of our discussion therein, and the decision in Weyerhaeuser Co. v. United States, 402 F.2d 620 (9th Cir. 1968), plaintiffs' claims under section 1231 are denied. Accordingly, plaintiffs' uninsured casualty losses in 1957 and 1958 were losses subject to section 1231 and are not deductible under section 165 as ordinary losses. Plaintiffs are not entitled to recover on this issue.

Plaintiffs' motion for summary judgment is granted on its section 265(2) claim and denied as to its section 1231 claim. Defendant's cross-motion for summary judgment is denied as to the section 265(2) issue and granted as to the section 1231 issue. The petition is dismissed as to the section 1231 claim.

Accordingly, plaintiffs are entitled to recover on their section 265(2) refund claim and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 47(c).