**INVESTORS DIVERSIFIED
SERVICES, INC.**

v.

**The UNITED STATES.**

No. 245–72.

United States Court of Claims.

April 19, 1978.

---

David W. Richmond, Washington, D. C., attorney of record, for plaintiff. Barron K. Grier, Robert L. Moore, II, and Miller & Chevalier, Washington, D. C., of counsel.

Kenneth R. Boiarsky, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## OPINION

DAVIS, Judge.

For the years 1964 and 1965, plaintiff, Investors Diversified Services (IDS), filed consolidated income tax returns on behalf of an affiliated group of which it was the common parent. One of the members of the group was Investors Syndicate of America, Inc. (ISA), a wholly owned subsidiary of IDS. ISA was a face-amount certificate company registered under the Investment Company Act of 1940, 15 U.S.C. § 80a–28 (1970), and was subject to the banking laws of the state in which it was incorporated, Minnesota. Since its incorporation in 1940, ISA has been a financial institution engaged in the business of issuing, selling, and servicing face-amount certificates, investing in qualified assets, and making payments to certificate holders in accordance with the terms of the certificates.

Those certificates were of two types: installment and single-payment. The vast majority of the face-amount certificates issued by ISA during 1964 and 1965 were of the installment type, under which the holder made periodic payments to ISA over the number of years stated in the certificate (the periods ranged from 6 years to 22 years). Where the holder made payments in accordance with the certificate's terms until the maturity date, ISA agreed to pay the holder, at that time, at least the face amount of the certificate, including an increment over the holder's total payments. The increment was based upon a stated percentage figure (which could not exceed 3½%), compounded annually. ISA also issued some single-payment-type certificates, under which the holder paid ISA a lump sum which was also to mature at a stated date. Upon the maturity of the certificate, ISA agreed to pay the holder the face amount of the certificate, which included a stated increment over the lump-sum amount the holder initially paid to ISA. Here, too, the increment could not exceed 3½% compounded annually. These certificates also provided that the holders could receive additional credits, over and above these stated increments, which could be granted at the option of ISA's Board of Directors, depending upon the investment performance of ISA during a particular year.

ISA could not require a certificate holder to redeem a certificate prior to maturity. That option was vested solely in the holder. Thus, so long as the holder of an installment-type certificate complied with the terms of the certificate, ISA had no right, under the provisions of the certificate, to return his payments or otherwise discharge its obligation to him prior to maturity. Yet the holder had the right to demand at any time payment of the amount credited to his account, and ISA did not have any right to refuse payment on a certificate presented prior to maturity. A holder offering a certificate for redemption prior to maturity got the cash surrender value, as stated on the certificate, plus any applicable additional credits that may have been granted by ISA's Board of Directors. Under the terms of the installment-type certificates having maturity dates of 15 or more years, the "cash surrender value" to the holder was less than the total payments made by the holder until after the end of the eighth certificate year. Nevertheless, at least 50% of the installment-type certificates were surrendered before the end of the eighth year. These purchasers could still have made a profit if sufficient additional credits had been granted by ISA prior to surrender of the certificate.

The certificates were sold by salesmen of the parent IDS in conjunction with the sale

of unrelated mutual funds and life insurance. No effort was made by ISA to control the number or type of its certificates sold, and as many certificates were sold as was possible. Investment decisions were also, by contract, handled by IDS.

Under section 28(a) of the Investment Company Act of 1940, 15 U.S.C. § 80a–28(a) (1970), a face-amount certificate company is required to maintain at all times "minimum certificate reserves" on all of its outstanding certificates. The required reserve for each certificate is an amount which, with future payments (if any), when compounded annually at a stated rate of not to exceed 3½% will equal the face amount of the certificate at maturity. Sections 28(b) and (c) of the Investment Company Act of 1940 required ISA to deposit and maintain cash or "qualified investments" equal to 100% of this "minimum certificate reserve." "Qualified investments" is defined to mean "investments of a kind which life-insurance companies are permitted to invest in or hold under the provisions of the Code of the District of Columbia * * * and such other investments as the [Securities and Exchange] Commission shall by rule, regulation, or order authorize as qualified investments." 15 U.S.C. § 80a–28(b) (1970). Generally, qualified investments consist of real estate mortgages, U.S. Government and municipal bonds, and securities of "blue-chip" industrial, finance, public utility, and transportation companies.

In order to maintain the required level of qualified investments, ISA invested its funds in a diversified portfolio. These investment funds came from sales of new certificates, payments received on installment-type certificates previously sold, and from returns on investments previously made—including dividends, interest, repayments of principal and proceeds from the sale of portfolio securities. In 1964 and

1965, approximately two-thirds of the funds available for investment came from ISA's investment portfolio, and about one-third came from sales of new certificates and installment payments on old certificates. As the result of a specific policy and program adopted in 1954, a substantial portion of the company's qualified investments has, since at least 1958, consisted of tax-exempt bonds. In 1964, tax-exempt bonds constituted 29.271% of ISA's qualified investments; in 1965, these bonds formed 28.567% of its total assets. The overwhelming portion of these bonds had maturity dates of 15 or more years, and they were purchased with the intention and practice of holding them until maturity. These tax-exempt bonds, along with others of its securities, were used by ISA (under collateral security agreements) to fulfill the statutory demand that ISA maintain a reserve of qualified assets sufficient to guarantee its face-amount certificate indebtedness.[1]

Since IDS filed its consolidated federal income tax returns for 1964 and 1965 on the accrual basis, it deducted as interest expense both the annual increments and additional credits that had been credited on ISA's face amount certificates during those years; this equalled the ratable part of the difference between the amounts which it received from the certificate holder, and the amount which it ultimately would pay to that holder.

Upon auditing IDS's income tax returns for 1964 and 1965, the Internal Revenue Service determined that ISA's interest expenses were partially proscribed by section 265(2) of the Internal Revenue Code. That section provides for the nondeductibility of interest on indebtedness incurred to purchase or carry most obligations on which the interest is exempt from federal income tax.[2] Since 1964, certain face amount cer-

---

1. For this purpose, all of ISA's holdings of tax exempts were maintained on deposit at banks and other depositories under collateral security agreements securing the face-amount certificate indebtedness.

2. Section 265(2) as amended by Revenue Act of 1964, Pub.L. No. 88–272, § 216(a), 78 Stat. 19, 56, provides:

"No deduction shall be allowed for—
\* \* \* \* \* \*
(2) *Interest.*—Interest on indebtedness incurred or continued to purchase or carry obli-

tificate companies, such as ISA, are exempt from this limitation to the extent that the average amount of tax exempts held by the company does not exceed 15 percent of its total assets.

In the statutory notice of deficiency for 1964, the Commissioner determined the total deductible interest and expenses of ISA to be $14,037,083 of which 14.271%,[3] or $2,003,232.11, was held to be not deductible under section 265(2). In the 1965 deficiency notice, 13.567%,[4] or $2,429,334.17, of the $17,906,200.14 of interest and expenses claimed by ISA, was asserted to be non-deductible under section 265(2). As a result of these determinations, the Commissioner assessed a deficiency for 1964 in the amount of $1,036,026.41 and interest thereon in the amount of $411,987.45; the deficiency for 1965 was $1,147,756.77 and interest in the amount of $385,146.64. In due course IDS paid these deficiencies and interest, filed claims for refund, and, having failed to obtain administrative relief, instituted this suit. IDS's claims for refund, however, seek a slightly lower total amount than was assessed by the Commissioner: the 1964 refund claim is only for $1,001,616.06 and $398,303.79 in interest, while the 1965 claim is for $1,166,080.40 plus $385,146.44 in interest.

## I

The only issue before us is whether ISA's face-amount certificates represented in-debtedness which was incurred or continued to purchase or carry the tax exempt bonds in ISA's investment portfolio, thereby precluding, under section 265(2), see note 2, supra, a portion of the tax deductions for the annual increments and additional credits which ISA credited to the certificates during 1964 and 1965.[5]

In applying this statute a set of general principles is commonly accepted. By direction of Congress, the deduction of interest paid on borrowed money is precluded only if the indebtedness was "incurred or continued to purchase or carry" exempt obligations. No mechanical bar is imposed on the deduction of such interest, for instance by automatic ratable allocation. See Leslie v. Commissioner, 413 F.2d 636, 638 (2d Cir. 1969), cert. denied, 396 U.S. 1007, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970). Accordingly, section 265(2) does not govern unless the facts reveal that the taxpayer's purpose in incurring or continuing an indebtedness is to purchase or carry such tax exempt securities. Phipps v. United States, 414 F.2d 1366, 1372, 188 Ct.Cl. 531, 539-40 (1969); Norfolk Shipbuilding and Drydock Corp. v. United States, 321 F.Supp. 222, 229-30 (E.D.Va.1971); Rev.Proc. 70-20, 1970-2 Cum.Bull. 499, Sec. 2.01. This prohibited aim can be found where there is a "direct relationship" between the indebtedness and the securities. Illinois Terminal R.R. v.

gations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest on which is wholly exempt from the taxes imposed by this subtitle. In applying the preceding sentence to a financial institution (other than a bank) which is a face-amount certificate company registered under the Investment Company Act of 1940 (15 U.S.C. 80a–1 and following) and which is subject to the banking laws of the State in which such institution is incorporated, interest on face-amount certificates (as defined in section 2(a)(15) of such Act) issued by such institution, and interest on amounts received for the purchase of such certificates to be issued by such institution, shall not be considered as interest on indebtedness incurred or continued to purchase or carry obligations the interest on which is wholly exempt from the taxes imposed by this subtitle, to the extent that the average

amount of such obligations held by such institution during the taxable year (as determined under regulations prescribed by the Secretary or his delegate) does not exceed 15 percent of the average of the total assets held by such institution during the taxable year (as so determined)."

3. This figure was arrived at by subtracting the 15% specifically excluded by section 265(2), supra, from the 29.271% of plaintiff's total assets which constituted tax-exempt securities.

4. See note 3, supra.

5. Defendant has not argued that the annual increment and the additional credit should be treated differently for tax purposes, and we shall so assume. See I.R.C. § 301, Investors Syndicate of America, Inc. v. Simon, 407 F.Supp. 83 (D.D.C.1975).

*United States,* 375 F.2d 1016, 1021, 179 Ct.Cl. 674, 683 (1967); *Norfolk Shipbuilding and Drydock Corp. v. United States,* 321 F.Supp. at 229. On the other hand, the mere contemporaneous existence of the indebtedness and the ownership of tax-exempt obligations does not *ipso facto* establish the barred purpose within the meaning of section 265(2), *Wisconsin Cheeseman, Inc. v. United States,* 388 F.2d 420, 422 (7th Cir. 1968). Something more directly establishing the required nexus must exist, *cf. Phipps v. United States,* 414 F.2d at 1372, 188 Ct.Cl. at 540 (pledging of exempt securities for loan does not preclude interest deduction unless "direct relationship" is also shown). Cases also hold that the objectionable purpose does not exist where the indebtedness is incurred or continued because of reasonable business (non-tax) demands calling for the holding of the tax-exempts. *Illinois Terminal R.R. v. United States,* 375 F.2d at 1021, 179 Ct.Cl. at 683; *Wisconsin Cheeseman, Inc. v. United States,* 388 F.2d 420 at 423; *Norfolk Shipbuilding and Drydock Corp. v. United States,* 321 F.Supp. at 231–32; *Edmund F. Ball,* 54 T.C. 1200, 1209 (1970). If there are varying purposes for incurring or continuing the debt, the dominant end must be to purchase or carry tax-exempt securities before section 265(2) will apply. *Illinois Terminal R.R. v. United States,* 375 F.2d at 1023, 179 Ct.Cl. at 686; *Phipps v. United States,* 515 F.2d 1099, 1102, 206 Ct.Cl. 583, 589 (1975). In a word, where the issue is disputed there should always be an inquiry, more-or-less particularized, into the connection and relationship between the tax-exempts and the indebtedness so as to discover whether in fact the taxpayer used borrowed funds for the primary purpose of purchasing or carrying those securities.

6. Defendant does not contend that the 1964 amendment to section 265(2), Revenue Act of 1964, Pub.L. No. 88–272, § 216(a), 78 Stat. 19, (which excludes tax-exempt holdings of face-amount certificate companies if such holdings form no more than 15% of the company's total assets) provides the upper limit of exclusion for such companies and that all exempt holdings above that percentage necessarily fall within the prohibitions of section 265(2). In this position defendant is correct, for the 1964 amend-

## II

The Government does not directly dispute these axioms but rather asserts that here the prohibited relationship between the taxpayer's certificates and the tax-exempt holdings can be inferred from ISA's general intent to invest and its actual investment in exempt securities.[6] Principal reliance is placed on the Supreme Court's decision in *United States v. Atlas Ins. Co.,* 381 U.S. 233, 85 S.Ct. 1379, 14 L.Ed.2d 358 (1965), and the Court's interpretation of *Denman v. Slayton,* 282 U.S. 514, 51 S.Ct. 269, 75 L.Ed. 500 (1931). In *Atlas,* the Government says, the Supreme Court construed section 265(2) to be applicable "whenever a taxpayer borrows for the purpose of making investments and *in fact* invests funds in exempt securities." 381 U.S. at 248–49, n. 17, 85 S.Ct. at 1388 (emphasis added). Additionally, it is claimed, *Atlas* explicitly rejected the taxpayer's major argument in this case that no direct relationship exists because ISA would be unable to affect its indebtedness by sale of its tax-exempt holdings.

The question in *Atlas* was whether section 804 of the Life Insurance Company Income Tax Act of 1959 was unconstitutional because it placed an impermissible tax on interest earned by life insurance companies from state and municipal bonds. Section 804 requires a life insurance company to divide its investment income, including tax-exempt interest, on a pro rata basis between two accounts, one for the company and the other for the policyholders. "The policy holders' share is added to the reserve, is excluded for tax purposes from the gross income of the company and is not taxed to

ment merely provided a safe harbor up to the 15% level. Beyond that, the courts are to apply the test otherwise applicable in order to determine if the prohibited purpose exists, and if so found, to deny deductions on a proportionate amount of interest. This is made clear in the legislative history. H.Conf.Rep. No. 1149, 88th Cong., 2nd Sess. 32, reprinted in 1964–1 Cum.Bull. (Part 2), 805. The taxpayer has the burden of persuasion.

either the company or the policyholder. The company's share of investment income is then reduced by its share of tax-exempt interest to arrive at taxable investment income." 381 U.S. at 239, 85 S.Ct. at 1383. If tax-exempt interest were not prorated between the accounts, the life insurance company could deduct its addition to the policy holder's reserve and all of its tax-exempt income, rather than only the pro rata portion of the exempt income going to the company account. Atlas argued that all of the tax-exempt income should be allocated to the company's account because the section 804 allocation violated the constitutional prohibition against federal taxes on state and municipal obligations. In the context of upholding the constitutionality of this proration, the Court, in a footnote, used the language now urged by the Government as dispositive.[7]

The Government's reasoning, though we think it incorrect, is quite sophisticated. It starts with the proposition that Atlas urged that the policyholder's reserve increment should be viewed as a cost of doing business, and as such, had no relation to the tax-exempt income, which should thus be separately deductible by the company.[8] Defendant's argument continues that the

Court (in the part of the opinion quoted *supra* at note 7), accepting this Atlas position *arguendo,* then considered whether that expense was attributable to the production of exempt income so that deductions therefor could be denied under *Denman;* the Court's conclusion was that *Denman* governed and that "interest can be said to be incurred or continued as a cost of producing exempt income whenever a taxpayer borrows for the purpose of making investments *and in fact invests funds in exempt securities* " (emphasis added). The next leg of defendant's presentation to us is that, since *Denman* considered the constitutionality of the predecessor of section 265(2), *Atlas'* pronouncements on *Denman* necessarily apply to 265(2) and, therefore, the latter statute controls whenever a taxpayer borrows to make investments and then in fact invests in tax-exempts.

To put it another way, defendant says: although the concern of *Atlas* was with the constitutionality of section 804 of the Life Insurance Company Income Tax Act, that issue and the reasonableness of the allocation under that Act were tested by the Supreme Court by the standard of section 265(2), as understood by the Court, and

7. The portion of the *Atlas* opinion which the defendant invokes is contained in footnote 17, 381 U.S. at 248–49, 85 S.Ct. at 1387–88. After quoting the statement of a representative of the life insurance companies that "required interest cannot be construed to be true income or profit, just as the cost of goods sold by a merchant must be eliminated from his gross income," the footnote goes on to say:

"Under this view of the reserve increment, we think this case is strikingly similar to *Denman v. Slayton.* On this theory the reserve increment is an accrued expense in the nature of interest on the funds obtained from policyholders for investment, and the denial of that part of the deduction which exempt income bears to total investment receipts represents disallowance of an expense attributable to the production of exempt income, which is precisely what *Denman* permits. It is argued, however, that the rule of *Denman* disallowing deduction of exempt interest is limited to 'but for' situations: Interest incurred on loans used to purchase exempt bonds may be disallowed only where there would have been no interest charge except for the purchase of exempt securities. It is by no means clear that this is not the case here, for there is a relationship be-

tween the amount of the reserve increment, representing interest on funds obtained from policyholders, and the amount of a company's investments, exempt or otherwise, unless it be assumed that a company does not sell policies and obtain funds for the purpose of investment. However this may be, we do not read *Denman* so narrowly. We think interest can be said to be incurred or continued as a cost of producing exempt income whenever a taxpayer borrows for the purpose of making investments and in fact invests funds in exempt securities.

"There was no problem of allocating interest in *Denman,* but surely no one doubts that the case would not have been any different if the dealer there borrowed and purchased taxable securities with half the loan and used the other half to purchase exempt securities."

8. Defendant would also have us give greater significance to the Court's characterization of this argument as also being responsive to the taxpayer's other argument in its brief that such reserve additions were an expense which would have existed in the presence or absence of tax-exempt interest contributing to its net investment income.

under that gauge the disputed additional deduction in *Atlas* would have been disallowed. Thus, according to the Government, section 804 accomplished what section 265(2) would have accomplished anyway, and the meaning given the latter was a significant factor in upholding the former provision. Defendant concludes that the *Atlas* language stressed above should be taken literally and broadly as the Supreme Court's authoritative interpretation of section 265(2).

The same footnote in *Atlas* is also said to dispose of the present taxpayer's argument that ISA's indebtedness would be unaffected by changes in its holdings of tax exempts. The Government draws this from what it calls the Court's rejection of the "but for" test; this test says disallowance of interest deductions is permissible under section 265(2) only where there would have been no interest charge but for the purchase of exempt securities. In arguing the significance of the fact that its indebtedness remains unchanged through purchase or sale of its tax exempts, ISA is alleged to be saying that section 265(2) applies only where the interest on indebtedness exists solely because of the purchase of tax exempts. The failure of the "but for" argument to save the taxpayer in *Atlas* is said to apply with equal force to deny its relevance here.

This expansive reading of the *Atlas* footnote as applicable to section 265(2) is not persuasive to us; it unnecessarily puts too much into the *Atlas* Court's few words. *Atlas* was interpreting the constitutionality of an unrelated statute—section 804 of the Life Insurance Company Income Tax Act of 1959 which does not contain the "prohibited purpose" test of section 265(2). Section 265(2) is not mentioned in the *Atlas* footnote, and the statement now relied upon by the Government was not essential to the Court's decision. Indeed, the only basis for the Government's current interpretation of

that footnote is that the *Atlas* opinion uses some of the same wording as 265(2). But the Court's footnote 17 was wholly in reference to the constitutionality of the denial of an interest deduction [9] and a holding on that question does not show what the meaning of the statute is or must be. At most, *Atlas* indicates that, if section 265(2) had the meaning there advocated by the taxpayer, it would be constitutional.

Indeed, to accept the very broad construction of the *Atlas* footnote advanced by defendant would require us to reject a good deal of the case law in this area, particularly in those cases refusing to apply section 265(2) where ownership of exempt securities meets some business purpose. In *Illinois Terminal R.R. v. United States,* 375 F.2d 1016, 179 Ct.Cl. 674 (1967), for example, the taxpayer borrowed 20 million dollars for the purpose of investing in the assets of a defunct railroad company, and in selling one of those assets, invested part of the proceeds in tax-exempt bonds. Although we there applied section 265(2) to the taxpayer, the opinion clearly indicated that, had the taxpayer been able to assert a sufficient business purpose for continuing to hold its tax exempts while the indebtedness was outstanding, the claimed interest deductions on that loan would not have been barred by section 265(2). Yet if we construe the language in *Atlas* broadly and literally, no business purpose would have been sufficient to permit the disputed interest deductions. Similarly, the logical conclusion of the Government's construction of section 265(2) would require reversal of the courts' failure to prohibit interest deductions in such cases as *Wisconsin Cheeseman, Inc. v. United States,* 388 F.2d 420 (7th Cir. 1968), *Edmund F. Ball,* 54 T.C. 1200 (1970), and *Israelson v. United States,* 367 F.Supp. 1104 (D.Md.1973), *aff'd without published opinion,* 508 F.2d 838 (4th Cir. 1974). We find it hard to believe the *Atlas* Court could have intended, without discussion, to sweep

9. In indicating that to view the reserve increment as an accrued expense might make it vulnerable to disallowance as an expense attributable to the production of exempt income, the Court said such disallowance "is precisely

what *Denman* permits." *Denman* was a constitutional case, and the reference is to what *Denman* permits constitutionally. (In *Denman,* the "prohibited purpose" test was plainly satisfied no matter how interpreted.)

away this accepted law and to establish as the sole criterion under 265(2) whether a taxpayer who borrows for investment *"in fact* invests funds in exempt securities" (emphasis added).[10]

Another major difficulty with defendant's understanding of the *Atlas* language is that it is inconsistent with a venerable administrative interpretation of section 265(2). Literally read, *Atlas* would require that banks be disallowed interest deductions on their indebtedness to depositors since they too borrow from these depositors for the purpose of investing and do *in fact* invest (and substantially so) in tax-exempt securities. Yet as early as 1924, such bank indebtedness was excluded from the proscriptions of the precursor to section 265(2). I.T. 2028, III–1 Cum.Bull. 297 (1924);[11] Rev.Rul. 61–222, 1961–2 Cum.Bull. 58.[12] This interpretation has much Congressional support. See *Leslie v. Commissioner,* 413

F.2d 636, 638 (2d Cir. 1969), *cert. denied,* 396 U.S. 1007, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970).[13] Defendant attempts to deny the contradiction between this "bank exception" position and its present argument by noting that banks frequently borrow from depositors on a short-term basis (*e. g.,* three years) while the insurance companies before the Court in *Atlas* borrow on a long-term basis; since ISA borrows long-term, the Government says that *Atlas* may be understood literally without being inconsistent with these revenue rulings.[14] Our problem with this argument is that *Atlas* did not discuss the long or short term nature of the indebtedness; indeed, no principled reason has been given for this proposed distinction. Of the Internal Revenue Service's administrative interpretations of section 265(2), only Rev.Proc. 70–20, 1970–2 Cum.Bull. 499, Secs. 3.09, 3.10, provides any possible basis

10. Two other problems should be mentioned briefly. First, rejection of the "but for" test as the *only* permissible reading of *Denman* (assuming that the *Atlas* Court was passing upon the scope of *Denman* and thus of section 265(2)) does not carry the Government very far. Such rejection of the "but for" standard as the exclusive test for all cases does not logically preclude application of a "but for" test under certain factual circumstances. In arguing the significance of its continued indebtedness irrespective of its tax-exempt holdings, IDS does not have to urge adoption of the "but for" criterion as the sole gauge; such continuation of indebtedness need be only one of several factors determining the presence or absence of the required prohibited purpose.

Secondly, a literal interpretation of the Supreme Court's language in *Atlas* would be contrary to the Tax Court's refusal to give that language a very broad reading. In *Edmund F. Ball,* 54 T.C. 1200 (1970), the Tax Court construed the meaning of the *Atlas* footnote to be, at the least, inapplicable to a taxpayer who made no new investments in tax exempts during the years of indebtedness. It is noteworthy that our difficulty in placing great weight on the literal language of the *Atlas* footnote is shared by that court.

11. I.T. 2028, III–1 Cum.Bull. 297 (1924) provides in part: "It is clear that indebtedness incurred by reason of deposits in a bank is not incurred to purchase or carry tax-exempt securities * * *."

12. Revenue Ruling 61–222, 1961–2 Cum.Bull. 58, similarly provides:

"The provisions of section 265(2) of the Internal Revenue Code of 1954 have no application to interest paid on indebtedness represented by deposits in banks engaged in the general banking business since such indebtedness is not considered to be 'indebtedness incurred or continued to purchase or carry obligations * *' within the meaning of section 265."

13. Rev.Proc. 70–20, 1970–2 Cum.Bull. 499, Sec. 2.03, declares: "The Congress has repeatedly recognized that indebtedness incurred by a bank to its depositors is not to be treated as indebtedness incurred or continued to purchase or carry tax-exempt securities within the meaning of section 265(2). To do so would 'seriously interfere with the marketing of government securities, which are bought for the most part by banks * * *.' S.Rept. 558, 73rd Cong., 24 (1934), *cf.* H.Rept. 704, 73rd Cong., 21–22 (1934) and Hearings Before the Senate Committee on Finance on the Revenue Act of 1934, 73rd Cong., 206–209 (1934). Also, see 110 Cong.Rec. 2211–2215 (1964); Hearings Before the House Committee on Banking and Currency on H.R. 14026, 89th Cong., 152–153 (May 19, 1966)."

14. Alternatively, the Government argues that even if its current interpretation of *Atlas* is inconsistent with the revenue rulings, those rulings have never been tested against a Supreme Court decision and may well be wrong. But we must accept the rulings as the IRS's near-contemporaneous, long-continued, settled interpretation of the law—not as binding on this court, but as deserving of great weight.

for such a differentiation, and at most, that statement says that the absence of the direct relationship between indebtedness and tax exempts required by section 265(2) may be slightly more easily inferred when a bank borrows on a short-term basis. Other revenue rulings clearly apply section 265(2) irrespective of the long or short-term nature of the borrowing. *See, e. g.,* Rev.Rul. 67–260, 1967–2 Cum.Bull. 132. The conflict in the defendant's positions has not been dispelled, and it is one reason why we cannot accept the broad significance and meaning of the *Atlas* language which is urged upon us.

### III

■ Rejection of defendant's reading of *Atlas* does not end this case, however, for we must still decide whether the prohibited purpose to purchase or carry tax exempts can be found. It is the "bank exception" (already discussed in Part II) plus the similarity of ISA to banks which provide a strong reason for our inability to see the required relationship between ISA's indebtedness and its tax-exempt holdings. There are many comparisons between banks and face-amount certificate companies like ISA—for example, both are under the banking laws of the state of their incorporation; both are subject to an immediate and short-term demand, *see* Rev.Proc. 70–20, 1970–2 Cum.Bull. 499, Sec. 3.01; interference with the marketing of government securities caused by application of section 265(2) to banks might very well be equally true if this section were applied to financial institutions like ISA, Rev.Proc. 70–20, 1970–2 Cum.Bull. 499, Sec. 2.03, *see* note 13, *supra;* both institutions compete for the same savings of the general public; and both must invest money obtained from depositors/purchasers in order to secure payment of an agreed rate of interest on that indebtedness. In sum, the rationale for excluding banks from section 265(2) seems directly applicable to a financial institution like ISA. While as we have said, the statute does not explicitly make an exception for banks, a very longstanding administrative interpretation of the original legisla-

tion, apparently accepted over the years by the Congress, *see* note 13, *supra,* indicates that the theory of the statute is inapplicable to banks. Since we cannot separate banks from ISA for the purpose of section 265(2), we follow this ingrained IRS understanding and apply it to this case.

There are other telling grounds supporting ISA's contention that section 265(2) is inapplicable. It is important that (a) the essential nature of ISA's business was the borrowing of money which had to be invested in order to pay off the certificate-holders; (b) ISA would not and could not reduce this borrowing by disposing of its tax-exempts or abstaining from acquiring new ones, and (c) the sale of certificates (*i. e.,* the borrowing) was wholly separate from and independent of ISA's investing process and its investments, including the acquisition and maintenance of exempt securities. To take the last element first, the salesmen of ISA were encouraged to sell as many certificates as possible without regard to the type of certificate being sold or to the present or future investment policy of the company. Neither ISA nor its parent made any effort to control the number or the types of certificates being sold. The money from new certificate sales, from installment payments on old sales, and from income on previous investments was commingled for the purpose of making new investments, thus making it difficult to trace a direct connection between the proceeds from certificate operations and the acquisition or maintenance of tax-exempt bonds in the investment portfolio. Moreover, the investment operations of ISA were conducted without regard to the certificate operations. A separate (related) corporation, constituting the investment committee, surveyed the statutory range of possible investments, and purchased those securities that seemed most meritorious; tax-exempt securities were purchased when the committee determined them to be the most worthy available investment under then existing market conditions.

Also compelling is the fact that the issuance, sale and servicing of these certifi-

cates was the very essence of the business for which ISA was registered under the Investment Company Act of 1940. This is not the case of an enterprise, operating mainly on capital, which happens to borrow money for a particular purpose. In order to continue its existence, ISA had to borrow continually through the sale of these certificates. Liquidation of exempt securities, though possible, would not have relieved ISA from having to invest these borrowed funds in productive assets to meet its growing reserve requirements (which were accruing interest at the rate of 3½% compounded annually) and to assure its own profitability. Continual investment was therefore a business necessity. Were ISA statutorily prohibited from holding any tax-exempt securities, its indebtedness and investment decisions would be made in the same manner as was done here.

It is equally significant that ISA was unable to reduce or affect its indebtedness through disposition of its tax-exempt holdings. Such a sale (though it could be accomplished) would not affect ISA's indebtedness since its certificate holders alone had the power to terminate or reduce its indebtedness. This inability to affect the amount of its indebtedness supports our view that the relationship between the certificates (representing the indebtedness) and the tax-exempts is too remote for section 265(2) to apply. Cf. Illinois Terminal R.R. v. United States, 375 F.2d at 1021, 179 Ct.Cl. at 683 (power of taxpayer to liquidate bondholdings and use proceeds to reduce debt without adversely affecting working capital held to be significant factor warranting applicability of section 265(2)); Israelson v. United States, 367 F.Supp. at 1107 (ability to avoid borrowing by sale of exempt securities main reason for applying section 265(2)); Rev.Proc. 72–18, 1972–1 Cum.Bull. 740, Sec. 4.04 (individual taxpayer may rebut presumption that section 265(2) applies

when holding exempt securities which are not directly connected with personal expenditures or with the active conduct of a trade or business by establishing he could not have liquidated his holdings of tax exempt obligations in order to avoid incurring indebtedness); Rev.Proc. 72–18, 1972–1 Cum.Bull. 740, Sec. 6.02 (purpose to carry tax-exempt obligations can be inferred where corporate taxpayer continues indebtedness which it could discharge, in whole or in part, by liquidating its tax-exempt holdings). Indebtedness is normally not incurred or continued for the purpose of buying or carrying tax-exempts if the indebtedness is independent of the holding of the exempt securities. Cf. Wisconsin Cheeseman, Inc. v. United States, 388 F.2d at 422, 423; Israelson v. United States, 367 F.Supp. at 1106–07. In this case the indebtedness was so independent that it would not and could not be reduced or eliminated even if all the tax exempts were sold.[15]

True, the fact still remains that ISA, while enjoying a substantial amount of tax-exempt income, deducted all of its accruals of payments to the certificate holders—and the Supreme Court has said that "the tax laws may require tax-exempt income to pay its way," United States v. Atlas Ins. Co., 381 U.S. at 247, 85 S.Ct. at 1387. But, as we have already indicated and the "bank exception" proves directly, Congress did not, in section 265(2), go all the way to implement that principle—as it did in the insurance statute involved in Atlas, or it could have done here by providing for automatic allocation.[16] Instead, Congress restricted 265(2) by the purpose-of-the-borrowing test which necessarily involves a weighting of such factors as those we have just considered. The inevitable result is that, as here, "a taxpayer might earn tax exempt interest with the proceeds of borrowing, [and] if the money was not bor-

---

15. In Leslie v. Commissioner, 413 F.2d 636, 639, 640 (2d Cir. 1969), cert. denied, 396 U.S. 1007, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970), it was clear that the taxpayer, if it had held no tax-exempts, would have had to borrow less.

16. As pointed out in Leslie v. Commissioner, supra, 413 F.2d at 638, Congress did provide in companion provision section 265(1) for non-deductibility by mechanical allocation (of otherwise deductible expenses) to classes of exempt income other than interest.

rowed for the purpose of purchasing or carrying tax exempt bonds he would get the double advantage of both a tax deduction for the interest expense and no tax on the interest earned." *Wynn v. United States,* 288 F.Supp. 797, 802 (E.D.Pa.1968), *aff'd per curiam,* 411 F.2d 614 (3rd Cir. 1969), *cert. denied,* 396 U.S. 1008, 90 S.Ct. 565, 24 L.Ed.2d 500 (1970) (footnote omitted).

## IV

Defendant emphasizes a number of factors (in addition to those already touched on), but we think that none of them, individually or together, outweighs the considerations we have discussed in Part III, *supra.* One such element pressed by the Government is a sentence in ISA's prospectus mentioning state and municipal government bonds (along with other solid securities). Beginning in 1947 and continuing through 1963, the prospectuses filed with the S.E.C. stated that, "The Company has invested, and presently expects to continue its investments, in a portfolio consisting of [a listing including *inter alia*] * * * state and municipal government bonds." (In the prospectuses for years after 1963, the words "an presently expects to continue its investments" were deleted). We consider this statement as no more than a normal indication to prospective certificate purchasers that ISA would invest their money in sound and "blue chip" securities— and not as any sort of undertaking to use tax-exempts (in preference to other solid investments).[17]

Another facet of the case stressed by the Government is that in 1954 ISA adopted a specific policy and program for the expansion of its investments and holdings in tax exempts, as compared with its other investments. From 1960 through 1973, year-end holdings of tax exempts ranged from 23½% (1970) to 33½% (1960) of total assets. (In 1964 and 1965—the tax years involved here—the percentages were 29.11 and 28.-20).[18] In the face of the factors referred to in Part III, *supra*—the long-established rule for banks; ISA's business as a total borrower which had continuously to invest to meet its obligations to certificate-holders; ISA's inability to reduce its indebtedness by disposing of its tax exempts; the complete separation between the sale of certificates and ISA's investment policies— we do not see any critical significance under section 265(2) in the fact that ISA had a plan of increasing its holdings of tax-exempts, rather than acting from year to year on an *ad hoc* basis. The cleavage between the borrowing and the tax-exempts would exist in either circumstance.

In particular, we do not find it crucial that, from 1954 on, ISA knew that it would acquire a substantial amount of tax-exempts each year. Such a course of conduct might be important in some cases to show the required nexus,[19] but here it has much less force. In view of the factors showing the complete separation of the borrowing from the acquisition and retention of tax-exempt securities, ISA's knowledge that it would purchase and hold such obligations was legally no more, for example, than a knowing, deliberate retention of tax-exempts while mortgaging a home, plant, or real estate tract. *See Wisconsin Cheeseman, Inc. v. United States,* 388 F.2d at 422,

---

17. Defendant does not argue that ISA was able to use its tax savings on the exempt obligations (obtained by deducting the accrued amounts to be paid to certificate-holders while paying no income taxes on the interest received) to increase the optional special credits which could be declared, or that certificate-holders (or potential certificate-holders) were induced to purchase certificates by the prospect of special credits attributable to such tax savings. Nor is the record such that we can say that either of these propositions is true in this case. *See also* note 5, *supra.*

18. Under the 1964 amendment to section 265(2), we are concerned, of course, only with the amounts above 15%. *See* notes 2, 6, *supra.*

19. *See Leslie v. Commissioner,* 413 F.2d at 639, in which the taxpayer could reduce or abolish his borrowing by disposing of tax-exempts, note 15, *supra; Wisconsin Cheeseman, Inc. v. United States,* 388 F.2d at 422–23, in which purchase of the tax-exempts required the taxpayer regularly to borrow further for economic needs of an ordinary recurrent variety.

423; *Israelson v. United States,* 367 F.Supp. at 1107.

Finally, defendant considers it weighty that ISA placed its tax-exempts (along with its other qualifed investments) as collateral securing the face-amount certificate indebtedness. This was required by the Investment Company Act of 1940 to protect the certificate holders.[20] That situation is different from the voluntary and deliberate use of tax-exempts as collateral to obtain bank loans. *See Wisconsin Cheeseman, Inc. v. United States,* 388 F.2d at 421, 422; *Phipps v. United States,* 515 F.2d 1099, 1100–02, 206 Ct.Cl. 583, 587–90 (1975). If we are right in Part III, *supra,* about the separation and independence of the indebtedness (i. e. the certificate sale) from the tax-exempts, the result is not changed because ISA, under compulsion of law, deposited its tax-exempts, along with its other holdings, to secure the certificate-holders.

V

For these reasons we hold that ISA has met its burden of showing that section 265(2) does not apply to it, for the years 1964 and 1965. Under the record in this case, ISA's purpose in incurring and continuing its certificate indebtedness was not, in those years, to purchase or carry the tax-exempt securities in its investment portfolio; for those years plaintiff can therefore deduct the interest and additional credits accruing on the face-amount certificates. Plaintiff is entitled to recover and judgment is entered in its favor. Pursuant to Rule 131(c), the case will be remanded to the Trial Division to determine the amount of plaintiff's recovery.

---

**20.** As we have said, the Act required ISA to deposit and maintain cash or qualified investments equal to 100% of the reserves on the certificates. The required reserve for each certificate is an amount which, with future payments, if any, when compounded annually at a stated rate of not to exceed 3½% will equal the face amount of the certificate at maturity.