**DILLON, READ & CO., INC. and Subsidiaries, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 165–85T.**

United States Claims Court.

Aug. 1, 1988.

---

George J. Noumair, New York City, for plaintiffs. Michael T. Kiesel, New York City, of counsel.

Alexandra E. Nicholaides, with whom were Asst. Atty. Gen. William S. Rose, Jr., Mildred L. Seidman, and Gerald B. Leedom, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

Pending before the court in this tax refund case are defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment. Pursuant to RUSCC 56(d)(3), the parties have filed a comprehensive stipulation of all of the material facts upon which they intend to rely. After consideration of the submissions and oral argument, defendant's motion is granted for the reasons expressed herein.[1]

### FACTUAL BACKGROUND

Plaintiff Dillon, Read & Co., Inc. ("Dillon, Read") filed its complaint here on March 25, 1985 seeking a total tax refund of $256,883 plus interest for the years 1974, 1975, 1976, and 1977. The complaint avers that the Internal Revenue Service ("IRS") improperly determined the amount of nondeductible interest expense for each of these years. Specifically, Dillon, Read maintains that the IRS incorrectly calculated the amount of nondeductible interest expense on indebtedness incurred or continued to purchase or carry tax-exempt obligations. See Internal Revenue Code ("I.R. C.") §§ 163(a), 265(2), 26 U.S.C. §§ 163(a), 265(2) (1982).

The parties have stipulated to all relevant material facts. The stipulated facts are contained in Appendix A of this opinion and will not be repeated here. In addition, the factual background and analysis con-

tained in the court's January 22, 1987 opinion, *Dillon, Read & Co. v. United States*, 11 Cl.Ct. 529 (1987), are incorporated here by reference.

## DISCUSSION

Section 163(a) of the Internal Revenue Code of 1954 allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." Section 265(2), however, disallows the deduction for "interest on indebtedness incurred or continued to purchase or carry obligations the interest on which is wholly exempt from" taxation. In its January 22, 1987 opinion, *Dillon, Read & Co. v. United States*, 11 Cl.Ct. 529 (1987), the court denied plaintiff's previous motion for summary judgment, which raised the limited question of "whether, under section 265(2), the collateralization of loans by taxable securities is conclusive evidence that interest paid on those loans is deductible." *Id.* at 530.

■ To disallow a deduction under section 265(2), the court must determine, based on all the facts and circumstances, that the interest involved pertains to indebtedness that was undertaken for the purpose of acquiring or continuing to hold tax-exempt securities. *E.F. Hutton Group, Inc. v. United States*, 811 F.2d 581, 583 (Fed.Cir.1987); Rev.Proc. 72–18 § 3.01, 1972–1 C.B. 740; *see also Investors Diversified Servs., Inc. v. United States*, 216 Ct.Cl. 192, 200, 575 F.2d 843, 848 (1978); *Phipps v. United States*, 188 Ct.Cl. 531, 539–40, 414 F.2d 1366, 1372 (1969); *Indian Trail Trading Post, Inc. v. Commissioner*, 60 T.C. 497, 500 (1973), *aff'd*, 503 F.2d 102 (6th Cir.1974). As the Court of Appeals for the Federal Circuit stated in *Barenholtz v. United States*, 784 F.2d 375, 379 (Fed.Cir. 1986), "section 265(2) applies only when the taxpayer's purpose in incurring or continuing an indebtedness is to purchase or carry tax-exempt securities. In general, this prohibited purpose is established by evidence

---

1. The parties agree, however, that because the IRS used an incorrect figure in its calculations, Dillon, Read is owed at least a refund of $19,-603.16 plus interest. *See infra* pp. 257–58. Ac-

cordingly, the court enters judgment for plaintiff in this amount. In all other respects, plaintiff's cross-motion is denied.

of a sufficiently direct relationship or nexus between the indebtedness and the securities." *See also Illinois Terminal R.R. v. United States,* 179 Ct.Cl. 674, 683, 375 F.2d 1016, 1021 (1967). "In determining a taxpayer's purpose for incurring or continuing an indebtedness, the courts are not confined to evaluating evidence of subjective intent, but may draw inferences from the taxpayer's conduct and the circumstances surrounding the relevant transactions." *Estate of Norris v. Commissioner,* 42 T.C. M. (CCH) 408, 413 (1981) (citing *Handy Button Machine Co. v. Commissioner,* 61 T.C. 846, 851 (1974)). Furthermore, the "taxpayer has the burden of overcoming the presumption of correctness of the Commissioner's determination that the prohibited purpose existed." *Barenholtz,* 784 F.2d at 379 n. 7; *see also Israelson v. United States,* 367 F.Supp. 1104, 1107 (D.Md.1973), *aff'd,* 508 F.2d 838 (4th Cir.1974); *Estate of Norris,* 42 T.C.M. (CCH) at 414; *Handy Button Machine Co.,* 61 T.C. at 852.

■ The taxpayer's purpose in incurring or continuing indebtedness can be established through either direct or circumstantial evidence. *See* Rev.Proc. 72–18 § 3.01, 1972–1 C.B. 740. In *Wisconsin Cheeseman, Inc. v. United States,* 388 F.2d 420 (7th Cir.1968), the court held that the collateralization of indebtedness with tax-exempt securities constitutes direct evidence of the prohibited purpose. *Id.* at 422; *accord Barenholtz,* 784 F.2d at 379 ("The fact that [plaintiff] used the tax-exempt bonds as collateral is direct evidence of the prohibited purpose."); *Phipps v. United States,* 206 Ct.Cl. 583, 589–90, 515 F.2d 1099, 1102 (1975); *Dillon, Read & Co.,* 11 Cl.Ct. at 533; Rev.Proc. 72–18 § 3.03, 1972–1 C.B. 740, 741; *Levitt v. United States,* 517 F.2d 1339, 1344 (8th Cir.1975); *Rifkin v. Commissioner,* Tax Ct.Mem.Dec. (P–H) ¶ 88,255 (June 8, 1988). The court concluded that one who borrows to buy tax-exempt securities and one who borrows against tax-exempt securities already owned are "in virtually the same economic condition." 388 F.2d at 422; *accord Barenholtz,* 784 F.2d at 379 (citing *Wisconsin Cheeseman,* 388 F.2d at 422). The exception to the general rule that the

use of tax-exempt securities as collateral is sufficient to establish the prohibited purpose applies where "(1) the taxpayer has a business purpose for the loan and (2) retention of the tax-exempt securities results from some compelling nontax reason." *Barenholtz,* 784 F.2d at 380 (citing *Investors Diversified Servs., Inc.,* 216 Ct.Cl. at 201–13, 575 F.2d at 848–55). Accordingly, the presumption that indebtedness collateralized by tax-exempt securities evidences the prohibited purpose is rebuttable.

In *Leslie v. Commissioner,* 413 F.2d 636 (2d Cir.1969), *cert. denied,* 396 U.S. 1007, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970), the court set forth a circumstantial evidence standard for establishing a purpose to purchase or carry tax-exempt securities. *Leslie* addressed the applicability of section 265(2) to a brokerage firm (Bache & Co.), which routinely borrowed from banks to finance its operations and which bought and sold tax-exempt securities in the ordinary course of business. Because the borrowed funds were commingled with Bache's other funds, however, it was impossible to trace loan proceeds to any particular use. The court stated:

Bache borrowed money for the purpose of conducting its business, including the holding of some tax-exempt securities, and ... since the use of the borrowed funds cannot be traced, it is reasonable to allocate them to all the business purposes of Bache....

Moreover, the fact that money was borrowed "in the conduct of Bache's large and many-sided business activities" by no means negates the existence of a purpose, to the extent that the borrowing allowed Bache to deal in and retain a portion of the tax-exempts....

....

"Allocation" in Section 265(1) should not be confused with allocation in order to determine the measure of the disallowance in a situation where it was not possible to trace borrowed money directly to the holdings of tax-exempt securities. Once a determination under Section 265(2) is properly made, i.e., that a portion of the indebtedness was incurred or

continued to purchase or carry tax-exempt securities, the purpose requirement is satisfied, and the fact that allocation is employed as a fairer measure of the appropriate disallowance than disallowing the entire interest on the outstanding debt does not take the interest expense out of Section 265(2).... There was a direct relationship between the continuance of the debt and the carrying of the tax-exempt securities.

413 F.2d at 639–41 (footnote omitted); accord E.F. Hutton Group, Inc., 811 F.2d at 584–85; Rev.Proc. 72–18 § 5.03, 1972–1 C.B. 740, 742.[2] In situations where the prohibited purpose exists but the use of borrowed funds cannot be directly traced, section 7.02 of Rev.Proc. 72–18 provides an allocation formula for determining the nondeductible portion of interest on indebtedness.

### A. Jurisdiction Over Dillon, Read's Alternative Claims

In both its complaint (filed March 25, 1985) and its previous motion for partial summary judgment (filed October 11, 1985), Dillon, Read did not contest the IRS' determination that interest on indebtedness secured by tax-exempt securities was nondeductible under I.R.C. § 265(2). See Complaint ¶¶ 14, 16, 23; Motion for Partial Summary Judgment at 2–3. Dillon, Read's only argument had been that indebtedness secured by taxable securities constitutes direct evidence that such indebtedness was not incurred or continued to purchase or carry tax-exempt securities—i.e., the interest on such indebtedness is deductible. See Dillon, Read & Co., 11 Cl.Ct. at 532–33 & n. 3. In effect, plaintiff argued that if the Wisconsin Cheeseman collateralization rule applies to Dillon, Read, then the same rule—with the opposite result—should apply to interest on indebtedness secured by taxable securities. This argument was rejected in the court's January 22, 1987 opinion. Id. at 533.

Dillon, Read has only recently argued, as an alternative to its initial theory of recovery, that no direct evidence exists to support a finding that its purpose in incurring or continuing indebtedness was to purchase or carry tax-exempt securities. It first asserted this alternative theory—that only the Leslie allocation formula, and not the Wisconsin Cheeseman collateralization rule, should apply here—at oral argument on the previous motion. See Dillon, Read & Co., 11 Cl.Ct. at 532 n. 3. The theory first appeared in written form in plaintiff's Motion for Reconsideration of the court's January 22, 1987 opinion.[3] In its recent cross-motion for summary judgment, Dillon, Read primarily argues in favor of the new theory and relegates its initial argument regarding symmetric application of the Wisconsin Cheeseman collateralization rule to a secondary alternative.

■ Although Dillon, Read did not originally plead its alternative theory or amend its complaint, these facts alone are not fatal to court consideration of the theory. The court's pleading rules allow a party to "state as many separate claims or defenses as he has regardless of consistency and whether based on legal or equitable grounds." RUSCC 8(e)(2). Because Dillon, Read raised its alternative theory for recovery in its cross-motion for summary judgment, to which defendant responded, and because defendant has not challenged the alternative theory on procedural grounds, the court will treat the complaint as amended to state the alternative theory. See Newman v. United States, 143 Ct.Cl.

2. Section 5.03 provides:
 Where indebtedness is incurred or continued for the general purpose of carrying on a brokerage business which includes the purchase of both taxable and tax-exempt obligations, and the use of the borrowed funds cannot be directly traced, it is reasonable to infer that the borrowed funds were used for all the activities of the business which include the purchase of tax-exempt obligations. Accordingly, section 265(2) of the Code is applicable in such circumstances. See Commissioner v. Leslie, 413 F.2d 636 (1969), certiorari denied, 396 U.S. 1007 [90 S.Ct. 564, 24 L.Ed.2d 500] (1970). However, in such a case only an allocable portion of the interest deduction is disallowed, as provided in section 7.

3. Because the motion was untimely and contained new factual assertions to which defendant had no opportunity to respond, it was denied in an order filed February 20, 1987.

784, 794 n. 1 (1958) (applying former Court of Claims Rule 18(b), now RUSCC 15(b), where an additional ground for recovery was first brought into the case through cross-motions for summary judgment); *Bobrick Corp. v. American Dispenser Co.*, 377 F.2d 334, 337 (9th Cir.1967); RUSCC 1(a)(2), 8(f).

■ The court must address an additional concern with respect to Dillon, Read's alternative theory. In its original tax returns for the years in issue, Dillon, Read computed nondeductible interest expense by applying only the *Leslie* allocation formula—in essence, its recently asserted alternative theory for recovery. Significantly, however, only the issue raised by plaintiff's previous motion for partial summary judgment was the basis for the taxpayer's refund claims with the IRS. *See* Plaintiffs' Proposed Findings of Uncontroverted Facts in Support of Motion for Partial Summary Judgment ¶ 6 (filed Oct. 11, 1985). Dillon, Read's refund claims were thus based solely on its initial ground for recovery regarding symmetrical application of the *Wisconsin Cheeseman* collateralization rule.[4] Consequently, at a telephone conference held with the parties on July 7, 1988, the court raised, *sua sponte*, the applicability of the variance doctrine. Under this doctrine, the court lacks jurisdiction to consider a ground for recovery not set forth in the claim for refund. *See Rowe v. United States*, 228 Ct.Cl. 269, 279–80, 655 F.2d 1065, 1071 (1981); *Forward Communications Corp. v. United States*, 221 Ct.Cl. 582, 623–24, 608 F.2d 485, 507–08 (1980); *Edde v. United States*, 217 Ct.Cl. 690, 691–93 (1978); *Union Pac. R.R. v. United States*, 182 Ct.Cl. 103, 108–14, 389 F.2d 437, 442–47 (1968) ("It is an undisputed general rule that a ground for refund neither specifically raised by, nor comprised within the general language of, a timely formal or informal application for refund to the Internal Revenue Service cannot be considered by a court in which a suit for refund is subsequently initiated."); *Neptune Mut. Ass'n v. United States*, 13 Cl.Ct. 309, 321–22 (1987); *Oregon Metallurgical Corp. v. United States*, 12 Cl.Ct. 447, 449 (1987); *Northern Ill. Gas Co. v. United States*, 12 Cl.Ct. 84, 90–91, *aff'd*, 833 F.2d 1582 (Fed.Cir.1987); I.R.C. § 7422(a); Treas.Reg. § 301.6402–2(b)(1) (1976). Although neither Dillon, Read nor the Government believes that the variance doctrine applies with respect to plaintiff's alternative theory of recovery, the court must consider the doctrine because it implicates the court's jurisdiction to reach the merits of that theory.

■ In *Union Pacific Railroad*, the Court of Claims indicated that the variance doctrine is designed

> both to prevent surprise and to give adequate notice to the Service of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination.... In addition, the Commissioner is provided with an opportunity to correct any errors, and if disagreement remains, to limit the scope of any ensuing litigation to those issues which have been examined and which he is willing to defend.

182 Ct.Cl. at 109, 389 F.2d at 442 (citations omitted). For several reasons, the above policy would not be furthered through application of the variance doctrine to Dillon, Read's alternative theory.

First, Dillon, Read computed nondeductible interest on its original tax returns using the methodology espoused by its alternative theory. The IRS, after auditing

---

**4.** Dillon, Read's refund claim for each year in issue provides:

> 2. Under Revenue Procedure [72–18], the proceeds of all secured loans must be deemed to have been used to purchase the assets used as collateral and no portion of the interest expense may be disallowed where the loans are directly secured by property other than municipal bonds, including corporate or government bonds or other taxable securities.

**3.** Further, only interest on any unsecured loans is subject to a proportional disallowance on an asset basis under sections 7.01 and 7.02 of Rev.Proc. 72–18.

All of Dillon, Read's general purpose indebtedness was secured. *See infra* Stipulation ¶ 9 (contained in appendix A).

each year's return, concluded that this methodology was incorrect. Although Dillon, Read did not explicitly reassert the appropriateness of a pure *Leslie* allocation method in its refund claims, the IRS was on notice that the taxpayer believed, at least initially, that such a method was proper. In effect, the IRS expressed its position on plaintiff's alternative theory by disallowing certain interest deductions after the audit. Accordingly, as defendant represented at the July 7, 1988 telephone conference, "the Commissioner was neither misled nor deceived by the absence of a formal claim." *Union Pac. R.R.*, 182 Ct.Cl. at 109, 389 F.2d at 442; *see also id.* ("[R]ecovery on an item not specified in a claim, has been permitted if the Service had notice of the ground involved."). The Government would thus not be prejudiced by court consideration of Dillon, Read's alternative theory.

Second, Dillon, Read's two theories of recovery are predicated on the same facts and involve an interpretation of the same Code provision (section 265(2)). Accordingly, "the Commissioner was in possession of enough information to focus on the merits of the refund claim, and cannot reasonably insist that the alternative approach creates the element of 'surprise' which the regulations seek to prevent." *Edde*, 217 Ct.Cl. at 693. In fact, the Government admits that it was not surprised by the alternative theory or the facts on which it is based. *See* Transcript of Proceedings (July 7, 1988) (telephone conference discussing the applicability of the variance doctrine).

Finally, the IRS' position regarding Dillon, Read's alternative theory, as expressed by the Department of Justice, is clear. An amendment of plaintiff's refund claim to detail specifically its alternative theory, which a court may permit if "the Commissioner was neither misled nor deceived by the absence of a formal claim," *Union Pac. R.R.*, 182 Ct.Cl. at 109, 389 F.2d at 442, would therefore not accomplish anything; the IRS would simply deny the amended refund claim for the reasons already provided by defendant. Accordingly, the Commissioner has had "an opportunity to correct any errors." *Id.*

For the above reasons, the court concludes that the variance doctrine does not apply. The court will therefore consider the merits of Dillon, Read's alternative theory.

B. *The Merits of Dillon, Read's Primary Alternative* [5]

■ Although plaintiff concedes (under its primary alternative) the applicability of the *Leslie* inference and, consequently, the existence of circumstantial evidence of the prohibited purpose, it maintains that the *Wisconsin Cheeseman* collateralization rule should not also apply to a taxpayer such as Dillon, Read.[6]

It is undisputed that between 1974 and 1977, Dillon, Read incurred $543,307 in interest expense on indebtedness secured by tax-exempt securities. *See infra* Stipulation ¶ 2 (contained in appendix A). Nevertheless, Dillon, Read contends that the particular facts here demonstrate the absence

---

5. Although Dillon, Read lists its recently asserted theory as "Alternative 2" in the stipulation of facts, *see* Stipulation at 12 (in appendix A), it now argues that this alternative constitutes the correct application of Code section 265(2). Consequently, the court will hereinafter refer to plaintiff's recent theory—the theory that underlies Dillon, Read's original tax returns—as its primary alternative. *See Dillon, Read & Co.*, 11 Cl.Ct. at 532 n. 3 (referring to the primary alternative as plaintiff's "second approach").

6. Dillon, Read also argues that the *Wisconsin Cheeseman* collateralization rule is illogical, not a proper statement of the law, and, in any event, dicta. This argument is inconsequential given the Federal Circuit's opinion in *Barenholtz*,

which applied the *Wisconsin Cheeseman* collateralization rule in circumstances sufficiently similar to those here. 784 F.2d at 379. The court agrees, however, with plaintiff's contention that the *Wisconsin Cheeseman* decision did not set forth a *per se* collateralization rule. Nevertheless, the only exception to the general rule that the use of tax-exempt securities as collateral is sufficient to establish the prohibited purpose, *see Barenholtz, id.* at 379–80; *Investors Diversified Servs., Inc. v. United States*, 216 Ct.Cl. 192, 200, 208–10, 575 F.2d 843, 848, 852–53 (1978); *New Mexico Bancorporation v. Commissioner*, 74 T.C. 1342, 1354–57 (1980), does not apply to Dillon, Read. *See infra* pp. 254–55.

of direct evidence of the prohibited purpose. Specifically, Dillon, Read argues that, with respect to the indebtedness collateralized by tax-exempt securities, the prohibited purpose does not exist where:

(1) All of the loans in question, including the loans which were collateralized with tax-exempt securities, are made in the ordinary course for the purpose of conducting the regular business of the Taxpayer, which included the paying of expenses to run its operation and the purchase of both taxable and tax-exempt securities, but ... the funds could not be traced to any particular use;

(2) The decision to buy, hold, or sell tax-exempt securities was made without reference to the source of the funds—borrowed, on hand, or from the sale of tax-exempt or taxable securities;

(3) The decision to hold, rather than sell, tax-exempt securities was made without reference to whether funds would be needed from borrowings, if such securities were not sold;

(4) The decision to sell tax-exempt securities was made without reference to whether proceeds were needed for the repayment of loans;

(5) The making of a loan was made without reference to whether proceeds were needed to purchase taxable or tax-exempt securities or to pay expenses or to be used for other business purposes;

(6) The decision to collateralize a loan was made without reference to the use of the proceeds of the loan and without reference to whether the sale of collateral would have forestalled the making of the loan;

(7) If a decision was made to collateralize a loan, the decision to use taxable or tax-exempt securities as the collateral was made without reference to the use of the proceeds of the loan and without reference to whether the sale of collateral would have forestalled the making of the loan; [and]

(8) The making of loans and the buying, selling, or holding of tax-exempt securities were made without relation to each other and were made by different persons without consultation.

Plaintiff's Reply Brief at 2–3; *see* Stipulation ¶ 13 (contained in appendix A) (incorporating by reference the affidavit of David W. Niemiec, an officer and managing director of Dillon, Read). Dillon, Read thus maintains that the prohibited purpose does not exist because there is not a sufficiently direct relationship or nexus between the indebtedness and the collateralized tax-exempt securities.[7]

Given the Federal Circuit's holding in *Barenholtz* that "[t]here is no distinction between borrowing to buy tax-exempt [securities] and borrowing against [securities] already owned," 784 F.2d at 379 (citing *Wisconsin Cheeseman*, 388 F.2d at 422), the court must conclude that Dillon, Read's "use of the tax-exempt [securities] as collateral for [indebtedness] demonstrates the prohibited purpose."[8] *Id.; see also* Rev. Proc. 72–18 §§ 3.03, 5.01, 1972–1 C.B. 740, 741, 742. For several reasons, the eight facts cited by plaintiff in its reply brief, *see supra* p. 253, to the effect that the decision to incur indebtedness was completely segregated from the decision to buy, hold, sell, or collateralize securities, do not change this conclusion.

First, Dillon, Read was not compelled to hold tax-exempt securities or to use them as collateral. The decision to use tax-ex-

---

**7.** Dillon, Read also argues that a temporary Treasury regulation, Temp.Treas.Reg. § 1.163–8T, provides support for the proposition that collateralization of indebtedness is irrelevant in determining the deductibility of interest. The regulation, however, concerns the allocation of interest expense under I.R.C. §§ 163(d), 163(h), and 469. It has no relation to the determination of interest deductibility under section 265(2). Moreover, it does not purport to overturn Rev.Proc. 72–18, *Wisconsin Cheeseman*, or any other precedents that apply the collateralization rule under section 265(2). Accordingly,

the court gives no weight to the temporary regulation.

**8.** Although Dillon, Read attempts to distinguish the facts in *Wisconsin Cheeseman* from the case at bar, the factual differences are insufficient to prevent application of the legal principle involved, particularly in light of the *Barenholtz* decision. Moreover, neither *Barenholtz* nor *Wisconsin Cheeseman* limited its holding to taxpayers who are not broker/dealers.

empt securities as collateral was a business judgment. At oral argument, counsel for Dillon, Read indicated that the use of tax-exempt securities as collateral had certain advantages:

[Tax-exempt securities] are easier to use as collateral than other assets.... It is obviously much easier to use liquid securities than it is to take your furniture and fixtures or other types of receivables, or things of that type.

. . . .

[T]hese outfits can probably borrow a good, maybe 50, 75, maybe even 100 percent of the money they are borrowing without any collateralization if they are willing to pay much higher interest rates.... There are a lot of options, but this is the most efficient and most economic way of doing business, that of using the securities as collateral.

Transcript of Proceedings at 62, 67 (June 21, 1988); *see also Barenholtz v. United States*, No. 356–82T, Transcript of Proceedings at 5 (Cl.Ct. Dec. 13, 1984) (bench ruling) ("[The collateralized tax-exempt securities] were actually used as an aid and assistance in maintaining the loans which kept the business going. They were, in a sense put at risk that if there were a default on the loan, they might be sold out by the bank for purpose of collecting the loan."), *aff'd*, 784 F.2d 375 (Fed.Cir.1986). Consequently, the fact that Dillon, Read made a voluntary decision to collateralize indebtedness with tax-exempt securities, and had a business purpose [9] for doing so, *see Leslie*, 413 F.2d at 640; *Norfolk Shipbuilding and Drydock Corp. v. United States*, 321 F.Supp. 222, 230–31 (E.D.Va. 1971), evidences a "sufficiently direct rela-

tionship" between the indebtedness and the securities, notwithstanding the segregation of the decisionmaking functions.

Second, there is no distinction between borrowing to buy tax-exempt securities and borrowing against securities already owned. *Barenholtz*, 784 F.2d at 379 (citing *Wisconsin Cheeseman*, 388 F.2d at 422). Counsel for Dillon, Read conceded at oral argument that using the proceeds of indebtedness to purchase tax-exempt securities constitutes direct evidence of the prohibited purpose:

THE COURT: ... If loans had been directly traceable to the purchase of tax-exempts, I assume there would be no difficulty setting that part aside as clearly non-allowable?

MR. NOUMAIR: That is correct.

Transcript of Proceedings at 49 (June 21, 1988). Consequently, the fact that Dillon, Read secured indebtedness with tax-exempt securities also constitutes direct evidence of the prohibited purpose.[10]

Finally, Dillon, Read does not fall within the exception to the general rule that collateralization of indebtedness with tax-exempt securities is sufficient to establish the prohibited purpose. The exception "applies only where (1) the taxpayer has a business purpose for the loan and (2) retention of the tax-exempt securities results from some compelling nontax reason." *Barenholtz*, 784 F.2d at 380 (citing *Investors Diversified Servs., Inc.*, 216 Ct.Cl. at 201–13, 575 F.2d at 848–55). The stipulated facts demonstrate that Dillon, Read had a business purpose for its indebtedness. It has provided no evidence, however, to establish a compelling nontax reason for re-

**9.** The court's use of "business purpose" to characterize Dillon, Read's intent in using tax-exempt securities as collateral is distinct from any business purpose it had for the indebtedness. *See Barenholtz*, 784 F.2d at 380 (describing the exception to the general rule regarding collateralization with tax-exempt securities).

**10.** The colloquy that followed the above discussion at oral argument is quite revealing:

THE COURT: Suppose the rest of the balance of the loans and the assets are not related, in other words, you cannot trace. Does *Leslie* then apply at that point?

MR. NOUMAIR: After pulling out, of course, the assets purchased with the loans that were used to purchase them.

Transcript of Proceedings at 49. Plaintiff thus concedes that, at least when the proceeds of indebtedness are used to purchase tax-exempt securities, application of the *Leslie* circumstantial evidence rule—after first disallowing any interest deductions based on the existence of direct evidence of the prohibited purpose—is not precluded.

taining its tax-exempt securities. As the Federal Circuit stated in *Barenholtz:*

> The exception for compelling nontax reasons applies where an entity in the business of attracting deposits, such as a bank or an investment company, is legally required to retain securities to meet reserve requirements. In such a case, because of the existence of the deposits, liquidation of the securities would not result in a reduction of the taxpayer's indebtedness, *i.e.*, the indebtedness is "so independent that it would not and could not be reduced or eliminated even if all the tax exempts were sold." Similarly, courts have applied the exception where the taxpayer was compelled to accept tax-exempt securities as payments and the securities were not salable. In the latter situation, the tax-exempt securities "could not be liquidated and, hence, the taxpayers had no alternative for supplying their cash needs but to borrow money."

784 F.2d at 380 (quoting *Investors Diversified Servs., Inc.*, 216 Ct.Cl. at 210, 575 F.2d at 853, and *Illinois Terminal R.R.*, 179 Ct.Cl. at 683–84, 375 F.2d at 1021, respectively) (footnotes omitted). As the court stated earlier, Dillon, Read has not asserted that it was compelled, legally or otherwise, to retain or collateralize tax-exempt securities. As was the case for the taxpayer in *Barenholtz*, Dillon, Read

> demonstrated no compelling nontax reason for holding [its] tax-exempt bonds while incurring and continuing loans. Sale of [its] bonds would have eliminated the need for indebtedness, at least to the extent of the value of the bonds ...; and [it] was subject neither to any legal requirement that [it] retain the bonds nor to any impediment to selling them.

784 F.2d at 380. The fact that the decision to collateralize tax-exempt securities was made without reference to whether sale of the securities would have forestalled the need to incur indebtedness does not bring Dillon, Read into the exception. Plaintiff has provided no reason—besides the fact that certain business functions were segregated—why it couldn't raise money through the sale of tax-exempt securities rather than through the incurrence of indebtedness. Dillon, Read may, of course, organize its business any way it desires. Presumably it segregates its decisionmaking functions to minimize administrative inefficiencies and to maximize profits; the benefits of such segregation will likely be weighed against any undesirable tax consequences. The organization of its business, however, will not constitute a compelling nontax reason for holding tax-exempt securities unless that organization is somehow legally required.[11] Because Dillon, Read has not demonstrated that the manner in which it conducted its business was compulsory rather than simply the most efficient for an investment banker, the court concludes that its decision to collateralize tax-exempt securities was not made for a compelling nontax reason.[12] Accordingly, Dillon, Read has failed to rebut the presumption of the correctness of the Commissioner's determination that the indebtedness collateralized by tax-exempt securities directly evidenced the prohibited purpose. *See Barenholtz*, 784 F.2d at 379 & n. 7.

---

**11.** In this regard, the court notes its agreement with defendant's argument that Dillon, Read should not be allowed to insulate itself from the purview of section 265(2) through the elective segregation of decisionmaking functions. *See* Transcript of Proceedings at 10–11 (June 21, 1988); *cf. Indian Trail Trading Post, Inc. v. Commissioner,* 60 T.C. 497, 500 (1973) ("[A] taxpayer cannot insulate himself from the prohibition of section 265(2) by merely juggling the use of his available assets so as to create a surface sanitation of the indebtedness from the acquisition or holding of the tax-exempt obligations."), *aff'd,* 503 F.2d 102 (6th Cir.1974).

**12.** Dillon, Read also argues that an internal imputed interest charge (based on the rate at which the firm generally borrows) on all of its departments somehow "neutralizes" the tax consequences of purchasing securities and borrowing, and further demonstrates the absence of the prohibited purpose. *See infra* Niemiec Affidavit ¶ 7 (in appendix A). The court fails to see a link between this internal charge and the tax consequences of incurring indebtedness. In any event, Dillon, Read has not alleged that this imputed interest charge is legally required; it is apparently assessed as a matter of convenience or for other internal financial efficiencies.

## C. *The Merits of Dillon, Read's Secondary Alternative*[13]

■ Under its secondary alternative, Dillon, Read argues that if indebtedness collateralized by tax-exempt securities constitutes direct evidence of the prohibited purpose, then indebtedness collateralized by taxable securities should constitute direct evidence that the prohibited purpose does not exist as to that indebtedness. In effect, Dillon, Read believes that the *Wisconsin Cheeseman* collateralization rule, which applies to interest on indebtedness secured by tax-exempt securities, should also apply to indebtedness secured by taxable securities—i.e., collateralization with taxable securities constitutes direct evidence that the indebtedness was not incurred or continued to purchase or carry tax-exempt securities. As the court stated in its January 22, 1987 opinion, however:

Unfortunately for Dillon, defendant is in the enviable position of being able to disallow deductions in either of two circumstances: proof (direct or inferential) of an intent to purchase *or* to carry tax-exempt securities. This phenomenon occurs because under section 265(2), a loan can be linked to both taxable and nontaxable securities.... [T]he fact that loans are collateralized by taxable securities does not speak conclusively as to how those loan proceeds are used.

*Dillon, Read,* 11 Cl.Ct. at 533 (footnote omitted) (emphasis in original).[14] In Dillon, Read's case, both direct[15] and circumstantial evidence of the prohibited purpose exists.

In *E.F. Hutton Group, Inc. v. United States,* 811 F.2d 581 (Fed.Cir.1987), the court explained the circumstances in which the prohibited purpose may be inferred:

The fact that E.F. Hutton [a corporation engaged in the securities brokerage and investment banking business] may not have *incurred* the ... indebtedness specifically *to purchase* tax-exempts is not dispositive. But where trading in tax-exempts and the incurring of ... indebtedness both represent a regular, continuous, routine, and substantial part of taxpayer's daily business, taxpayer's decision to *continue* (rather than retire) its ... indebtedness undoubtedly facilitates its ability to *carry* tax-exempts. There is a clear correlation-and-parallelism which cannot be disregarded—a continued, solid tie between the incurring of ... indebtedness and the purchase and maintenance of tax-exempts. In these circumstances, § 265(2) operates to disallow the deduction of interest on the indebtedness.

*Id.* at 584 (footnote omitted) (emphasis in original). Because Dillon, Read trades in tax-exempt securities and incurs indebtedness as "a regular, continuous, routine, and substantial part" of its daily business, the court concludes that circumstantial evidence of the prohibited purpose exists as to that portion of indebtedness not collateralized by tax-exempt securities. *See id.* at 584–86; *Leslie,* 413 F.2d at 639–41; Rev. Proc. 72–18 §§ 3.04, 5.03, 7.02, 1972–1 C.B. 740, 741, 742, 743. As explained in section B, *supra,* direct evidence of the prohibited purpose exists as to the portion of indebtedness secured by tax-exempt securities.[16]

---

**13.** The court will hereinafter refer to plaintiff's initial theory of recovery, i.e., the theory espoused by Dillon, Read's previous motion for partial summary judgment, as the "secondary alternative." This alternative, although arguably disposed of by the court's January 22, 1987 opinion, was reasserted in plaintiff's pending motion.

**14.** The court's January 22, 1987 opinion left open the possibility that defendant could discover direct evidence linking Dillon, Read's indebtedness secured by taxable securities to the purchase of tax-exempt securities. *See Dillon, Read,* 11 Cl.Ct. at 533 ("If, by direct evidence, or, as potentially is the case here, by inference, the proceeds went in whole or part to purchase

tax-exempt securities, the deduction is proportionately lost."). Stipulation ¶ 10, *see infra* appendix A, indicates that the proceeds of Dillon, Read's indebtedness could not be directly traced to the purchase of tax-exempt securities. As explained below, only inferential evidence demonstrates that plaintiff's indebtedness secured by taxable securities was used to purchase or carry tax-exempt securities.

**15.** *See supra* section B (collateralization with tax-exempt securities constitutes direct evidence).

**16.** If all of Dillon, Read's tax-exempt securities were used as collateral, then no circumstantial evidence of the prohibited purpose would exist;

*See Barenholtz,* 784 F.2d at 379–80; *Wisconsin Cheeseman,* 388 F.2d at 422; Rev. Proc. 72–18 §§ 3.03, 5.01, 7.01, 1972–1 C.B. 740, 741, 742, 743.

■ Where both direct and circumstantial evidence of the prohibited purpose exists, as in the case at bar, the direct evidence rule must be applied first to avoid an excess disallowance of interest expense. The interest disallowed under the direct evidence rule, as well as the value of the collateralized tax-exempt securities, are removed from the allocation formula that is applied under the circumstantial evidence rule. *See* appendix B ("Application of Code Section 265(2) Using Hypothetical Values"); *cf. E.F. Hutton Group, Inc.,* 811 F.2d at 585–86. Thus, only interest expense attributable to indebtedness the proceeds of which cannot be directly traced to the purchase or carrying of tax-exempt securities—in the case at bar, indebtedness secured by taxable securities—is considered in the equation. *See* appendix B at 265 & n. 5, *infra.* The allocation formula calculates the nondeductible portion of this interest expense (i.e., the portion of interest expense *inferentially* linked—pursuant to *E.F. Hutton Group, Inc., Leslie,* and Rev.Proc. 72–18 § 5.03—to the purchase or carrying of uncollateralized tax-exempt securities).[17]

Consequently, the court concludes that Dillon, Read's secondary alternative is without merit. The direct evidence rule espoused by *Barenholtz, Wisconsin Cheeseman,* and Rev.Proc. 72–18 § 3.03 applies to plaintiff's indebtedness collateralized by tax-exempt securities.[18] The circumstantial evidence rule espoused by *E.F. Hutton Group, Inc., Leslie,* and Rev.Proc. 72–18 § 5.03 applies to Dillon, Read's remaining indebtedness.[19] At least in the case at bar, therefore, the two rules are not mutually exclusive.[20]

## CONCLUSION

On July 29, 1988, the parties filed a stipulation providing the amount of a tax refund that would be due Dillon, Read assuming that the IRS' method for computing nondeductible interest expense was correct (which the court has so concluded), but with one minor correction of an amount utilized by the IRS in its application of the *Leslie* allocation formula. *See* Stipulation at 260 n. 2, 261 & n. 4 (contained in appendix A); *Dillon, Read & Co. v. United States,* 15 Cl.Ct. 246 (Cl.Ct.1988) (order, amended June 29, 1988, regarding the stipulation of the refund amount). The IRS utilized the amount of the indebtedness secured by tax-exempt securities when it should have used the value of the collateral-

only direct evidence would exist. The fact that some of the tax-exempt securities were used as collateral and some were bought, sold, and held in the ordinary course of business establishes the existence of both direct and circumstantial evidence in this case.

17. Accordingly, if Dillon, Read used all of its tax-exempt securities as collateral, the allocation formula would not be applicable; only *direct* evidence of the prohibited purpose would exist. If, on the other hand, Dillon, Read did not collateralize any of its tax-exempt securities, then only the allocation formula would be applicable; only *circumstantial* evidence of the prohibited purpose would exist. The case at bar presents a hybrid of these two situations, thus warranting application of the direct evidence rule first, and the circumstantial evidence rule (i.e., the allocation formula) to the remaining tax-exempt securities. Appendix B demon-

strates the relevant calculations using hypothetical values.

18. Thus, Dillon, Read incurred or continued this indebtedness to carry tax-exempt securities.

19. Thus, given the taxpayer's business (an investment banker and broker/dealer in securities), an inference is made that Dillon, Read incurred or continued this indebtedness to purchase or carry tax-exempt securities.

20. Plaintiff concedes that the two rules would apply contemporaneously if the proceeds of indebtedness were used to purchase tax-exempt securities. *See supra* note 10. Because "[t]here is no distinction between borrowing to buy tax-exempt bonds and borrowing against bonds already owned," *Barenholtz,* 784 F.2d at 379, and for the reasons expressed above, the two rules must also be applied contemporaneously in the case at bar.

ized tax-exempts.[21] Appendix C contains the relevant corrected calculations and the amount of the tax refund due Dillon, Read. In all other respects, for the reasons expressed above, the court denies plaintiff's motion for summary judgment and grants defendant's motion. The Clerk is directed to enter judgment for plaintiff in the total amount of $19,603.16 ($2641.33 for tax year 1974, $610.63 for tax year 1975, $1422.53 for tax year 1976, and $14,928.67 for tax year 1977), plus interest pursuant to I.R.C. § 6611. No costs.

It is so ORDERED.

## APPENDIX A

### STIPULATION OF FACTS

Plaintiffs, Dillon, Read & Co., Inc. and Subsidiaries, and defendant, the United States, hereby stipulate, for purposes of this action only, the truth of the following facts during the 1974–1977 tax years (the "Period in Issue"). It is understood and agreed that the parties' stipulation shall not be deemed a stipulation as to the materiality or relevance of any statement set forth herein or in the attached schedule or affidavit. The parties reserve the right to add additional evidence that does not contradict any fact stipulated to herein.

1. At issue here is the correctness of the Internal Revenue Service's disallowance of interest deductions claimed by plaintiff, Dillon, Read & Co., Inc. (hereinafter referred to as "Dillon, Read"), as follows:

| Year | A Total Interest Expense | B Interest Deduction claimed per return | C Nondeductible interest per return | D Interest Deduction allowed by IRS | E Nondeductible per IRS |
|---|---|---|---|---|---|
| 1974 | 885,806 | 745,613 | 140,193 | 667,301 | 218,505 |
| 1975 | 1,160,850 | 1,045,874 | 114,976 | 1,035,823 | 125,027 |
| 1976 | 3,853,433 | 3,794,591 | 58,842 | 3,759,508 | 93,925 |
| 1977 | 6,774,384 | 6,588,807 | 185,577 | 6,397,384 | 377,000 |

2. Of the total amount of interest deemed non-deductible by the Internal Revenue Service (paragraph 1, Col. E) above, the following shows the breakdown of the total amount of interest disallowed:

| Year | Non-deductible interest on basis that loans bearing such interest were secured by tax-exempt securities | Non-deductible interest per IRS's application of the Leslie formula | Total Amount non-deductible per IRS |
|---|---|---|---|
| 1974 | 147,182 | 71,323 | 218,505 |
| 1975 | 55,721 | 69,306 | 125,027 |
| 1976 | 38,341 | 55,584 | 93,925 |
| 1977 | 302,063 | 74,937 | 337,000 |

3. Thus, the amount of interest expense disallowed by the Internal Revenue Service (paragraph 1, Col. 3. less Col. C) is as follows:

| Year | Amount Disallowed by Internal Revenue Service |
|---|---|
| 1974 | 78,312 |
| 1975 | 10,051 |
| 1976 | 35,083 |
| 1977 | 191,423 |

**21.** Dillon, Read pointed out the correct calculation in paragraph 5 of its refund claims to the IRS.

For example, for the 1974 year the IRS determined that $218,505 was the total amount of interest expense not deductible and reduced that amount by the amount plaintiff claimed on its return as non-deductible ($140,193) to arrive at the amount disallowed above ($78,312).

4. Of the total amount of interest deemed not deductible by the Internal Revenue Service (paragraph 1, Col. E) above, Dillon, Read challenges the following amounts:

| YEAR | AMOUNT |
|------|--------|
| 1974 | 71,323 |
| 1975 | 69,306 |
| 1976 | 55,584 |
| 1977 | 338,958 |

5. Dillon, Read was engaged during the Period in Issue in business as an investment banking firm, which business includes acting as a broker and a dealer in stocks and securities, including tax-exempt securities.

6. Dillon, Read incurred or continued indebtedness for the general purpose of carrying on its brokerage business, including the purchase of both taxable and tax-exempt securities.

7. Dillon, Read incurred interest expenses on indebtedness incurred or continued for the general purpose of carrying on its brokerage business, which business includes the purchase of both taxable and tax-exempt securities.

8. Dillon, Read collateralized a portion of its general purpose indebtedness with tax-exempt securities.

9. Dillon, Read used taxable securities to collateralize that portion of its general purpose indebtedness that was not collateralized with tax-exempt securities.

10. Plaintiff and defendant agree that none of the interest expense described in paragraph 1, column E, and paragraph 4, which arose from indebtedness or loans existing or incurred during the years at issue, can be directly traced to the purchase of either taxable or tax-exempt securities. Those loan proceeds were instead indiscriminately used for the general cash requirements of its business, which included the purchase of both taxable and tax-exempt securities.

11. The Internal Revenue Service did as follows in calculating the amount of interest expense disallowed. First, for each year, the Internal Revenue Service determined the total interest expense, thereafter reducing that amount by (1) the interest expense on loans that were directly traceable to collateral in the form of tax-exempt obligations and (2) the interest expense on indebtedness that was incurred for specific business purposes, on drafts, customer loans, internal indebtedness, customer accounts reported to the Securities and Exchange Commission (per SEC Rule 15C3-3) or secured by United States obligations. The reductions under subparagraphs (1) and (2) are not in dispute. The remaining balance of unallocated interest expenses was then multiplied by a fraction, the numerator of which was equal to the average annual amount of Dillon Read's inventory of tax-exempt assets that were not directly identifiable as collateral for loans [1] and the denominator of which was the average annual amount of total assets less the average annual amount of tax-exempt assets that were directly identifiable as collateral for loans.

For example (using 1974 amounts):

| | |
|---|---|
| Total interest expense = | $885,806.00 |

Less:
interest expense on loans collateralized by:

| | |
|---|---|
| tax exempt securities | $147,182.00 |
| US Treasury obligations | 1,999.00 |
| interest expense on drafts | 119,970.00 |
| other interest expenses | 73,366.00 |

---

1. With respect to 1976 and 1977 only, the numerator was further reduced by the "fails to receive less fails to deliver" amount for the year, which was $679,731 for 1976 and $19,224 for 1977.

| | | |
|---|---|---|
| Total interest expense not subject to allocation | $342,517.00 | $342,517.00 |

Interest expense subject to allocation $543,289.00

Numerator:

| | |
|---|---|
| Average annual amount of tax-exempt assets | $4,797,500 |
| Less average annual amount of tax-exempt assets used as collateral for loans | 1,315,000[2] |
| Balance of tax-exempt assets not used as collateral | $ 3,482,500 |

Denominator:

| | |
|---|---|
| Average annual amount of assets | $27,842,260 |
| Less average annual amount of tax-exempt assets used as collateral for loans | 1,315,000[3] |
| | $26,527,260 |

$$\frac{3,482,500}{26,527,260} \quad\quad\text{times } 543,289 =$$

| | | | |
|---|---|---|---|
| .131280 | times 543,289 = | $71,322.98 |
| Interest expense to purchase of tax-exempt assets | allocated = | $71,322.98 |

PLUS

| | |
|---|---|
| Interest expense directly related to loans collateralized by tax-exempts | 147,182.00 |

| | |
|---|---|
| Total amount of interest expense not deductible per 265(2) | $218,504.98 |

LESS

| | |
|---|---|
| Total amount of interest expense Dillon, Read reflected on schedule "M" as non-deductible interest expense | $140,193.00 |

| | |
|---|---|
| Net Disallowance made by IRS for 1974 tax year | $ 78,311.98 |

12. The relevant figures in this case (relating to assets, the portion thereof which are tax-exempt securities, the various categories of interest expense, the Internal Revenue Service's position, as set forth in its audit report and the plaintiffs' positions) are set forth on the attached schedule which schedule shall be part of this stipulation.

2. The examining revenue agent inadvertently used the amount of the loans, instead of the amount of the tax exempt securities. See page 261, item A(3).

3. See footnote 2.

13. The affidavit of David W. Niemiec is set forth in the attached Exhibit A and shall be part of this stipulation. However, defendant does not believe that the facts contained in the affidavit are relevant to this case and objects to the extent the affidavit includes conclusions of law.

### Schedule Attached to Stipulation

| | A<br>1974 | B<br>1975 | C<br>1976 | D<br>1977 |
|---|---|---|---|---|
| **A. Assets** | | | | |
| (1) Total Assets Owned by the Plaintiffs | $27,842,260 | $39,542,000 | $102,280,308 | $151,733,186 |
| (2) Tax-exempt obligations Held by the Plaintiffs (Included in A(1)) | 4,797,500 | 3,590,000 | 3,782,080 | 6,457,529 |
| (3) Tax-exempt obligations (portion of A(2)) which Secured Plaintiff's Obligations. The IRS used the following numbers: | 1,315,000 | 300,000 | 634,167 | 4,351,000 |
| Plaintiff contends that the Revenue Agent inadvertently used incorrect numbers and should be replaced with the following numbers: [4] | 1,547,059 | 352,941 | 746,079 | 5,118,824 |
| **B. Interest Expense Per Return** | | | | |
| (1) Interest Expense Deducted by Plaintiffs | 745,613 | 1,045,874 | 3,794,591 | 6,588,807 |
| (2) Interest Expense which was not deducted on Plaintiffs' returns and which was listed on Schedule M as non-deductible interest expense | 140,193 | 114,976 | 58,842 | 185,577 |
| (3) Total amount of interest expense incurred by the Plaintiffs | 885,806 | 1,160,850 | 3,853,433 | 6,774,384 |
| **C. Treatment of interest expense by the Internal Revenue Service** | | | | |
| (1) Total interest expense | 885,806 | 1,160,850 | 3,853,433 | 6,774,384 |
| (2) Interest expense on loans which were secured by tax-exempt obligations | (147,182) | (55,721) | (38,341) | (302,063) |
| (3) Interest expense on indebtedness which was incurred for specific business purposes, on drafts, customer loans, internal indebtedness, customer accounts which were reported to the Securities and Exchange Commission pursuant to Securities and Exchange Commission Rule 15C3–3 or which was secured by obligations of the United States | (195,335) | (278,479) | (1,525,794) | (1,181,107) |

4. Defendant does not contend that plaintiff's figures are incorrect. However, defendant included the numbers used by the Revenue Agent in order to aid the Court in following the formula and adjustments made by the Internal Revenue Service.

| | A 1974 | B 1975 | C 1976 | D. 1977 |
|---|---|---|---|---|
| (4) Balance-interest subject to allocation per <u>Leslie</u> case | $543,289 | $826,650 | $2,289,298 | $5,291,214 |
| (a) Non-deductible interest allocated to tax-exempts not used as collateral | 71,323 | 69,306 | 55,584 | 74,937 |
| (b) Deductible | 471,966 | 757,344 | 2,233,714 | 5,216,277 |
| (5) Recapitulation— | | | | |
| (a) Non-deductible: | | | | |
| C(2)–collateralized by tax-exempts | 147,182 | 55,721 | 38,341 | 302,063 |
| C(4) Balance (<u>Leslie</u>) | 71,323 | 69,306 | 55,584 | 74,937 |
| TOTAL | 218,505 | 125,027 | 93,925 | 377,000 |
| (b) Deductible: | | | | |
| C(3) Specific purpose | 195,335 | 278,479 | 1,525,794 | 1,181,107 |
| C(4) Balance (<u>Leslie</u>) | 471,966 | 757,344 | 2,233,714 | 5,216,277 |
| TOTAL | 667,301 | 1,035,823 | 3,759,508 | 6,397,384 |
| TOTAL interest = 5(a) + 5(b) | 885,806 | 1,160,850 | 3,853,433 | 6,774,384 |

D. Interest allowable as a deduction per Plaintiffs—

| | A 1974 | B 1975 | C 1976 | D. 1977 |
|---|---|---|---|---|
| (1) Alternative 1—Direct tracing—based on collateralization | | | | |
| (a) Specific purpose (C(3) above)—deductible | 195,335 | 278,479 | 1,525,794 | 1,181,107 |
| (b) Interest on indebtedness secured by taxable securities (deductible) | 543,289 | 826,650 | 2,289,298 | 5,291,214 |
| (c) Interest on indebtedness secured by tax-exempts (non-deductible) | 147,182 | 55,721 | 38,341 | 302,063 |
| (d) TOTAL | 885,806 | 1,160,850 | 3,853,433 | 6,774,384 |
| (2) Alternative 2—[5] Leslie formula (without reference to collateralization)— | | | | |
| (a) Non-deductible interest per application of Leslie formula | 140,193 | 114,976 | 58,842 | 185,577 |
| (b) Balance—deducted on return | 745,613 | 1,045,874 | 3,794,591 | 6,588,807 |
| (c) TOTAL | 885,806 | 1,160,850 | 3,853,433 | 6,774,384 |

**5.** Defendant does not agree in any way with plaintiff's application of the Leslie formula in its second alternative. In addition, defendant only stipulates to the fact that plaintiff has at this time two alternative theories and not to the correctness of either theory.

## AFFIDAVIT

STATE OF NEW YORK )
 ) ss.:
COUNTY OF NEW YORK )

DAVID W. NIEMIEC, being duly sworn, deposes and says:

1. I am an officer and a Managing Director of Plaintiff, Dillon, Read & Co. Inc. (the "Company"). In making this affidavit, I understand that it will be attached as an Exhibit to a Stipulation of Facts, which is to be entered into between the Plaintiffs and the Defendant in the above action. This affidavit is based on my general knowledge of the manner in which the Company generally operates, particularly in the areas of concern in this case.

2. As part of the regular course of its business, the Company buys and sells securities (both tax-exempt and taxable) for its own account, principally for the purpose of holding them for sale to customers. The Company establishes limits on the amount of securities that it is willing to hold or to own.

3. When the Company is in need of funds, it makes a determination as to whether such funds should be borrowed. In making the determination as to whether it ought to borrow, the Company does not make that determination by comparing its borrowing needs to the funds that could be raised through the sale of securities that it may hold. Any decision to borrow and any decision to sell or hold securities (whether taxable or tax-exempt) are made independently of each other.* The decision to borrow is made by persons different from those involved in the decision to buy or sell securities. There is no consultation between them. In addition, if the Company intends to acquire securities, whether taxable or tax-exempt, it does not make the decision to do so on the basis of whether it has funds otherwise available or whether it must borrow or sell other assets. Such decision is made independently of any determination of where the funds needed for the purchase are to be raised.

4. The proceeds of all the Company's borrowings are commingled with the Company's other funds and are fungible for all purposes. The Company does not segregate borrowed funds from other funds and use borrowed funds for one purpose and other funds for other purposes (except that, in accordance with New York Stock Exchange rules, it segregates customer credit balances).

5. In determining whether to collaterize a loan, and, if it is determined to collaterize such loan, to determine which securities should be used as collateral, the Company does not make such determination on the basis of the use of the proceeds of the loan; nor does it make such determinations on the basis of determining that the securities used as collateral are the basis for making the loan, i.e., the loan is not considered to be carried by the collateral—the purpose of the loan is independent of the securities used as collateral.

---

\* There is an exception in the U.S. Government bond area where the acquisition of U.S. Government bonds and Government guaranteed or backed bonds have for a number of years been financed separately in the so-called "repo market" (repurchase agreements). The Company's U.S. Government bond desk or function is operated separately and financed separately such that the debt incurred to finance the acquisition of U.S. Government bonds is in effect collateralized by such bonds. This appears to be similar to arrangements used by Bache and referred to in the *Leslie* case.

6. In short, the decision to borrow is essentially made independently of the particular use of the proceeds; the decision to acquire or sell tax-exempt securities is made independently of the decision to borrow; and the decision to collateralize a loan is made independently of the purpose of the loan and is not linked to the carrying of the securities used as collateral.

7. It should also be noted that as an internal matter, the Company changes each department—equity department, corporate bond department, municipal bond department, etc.—imputed interest on the total inventory outstanding. Such interest is charged at the broker's call rate (the rate at which the Company generally borrows) and the same rate is applied whether the inventory consists of municipal bonds, the interest on which may be tax-free, equities, the dividends on which may be subject to the dividends received deduction, or corporate bonds, the interest on which is wholly taxable. The internal imputed interest charge is made regardless of where the funds come from to make the purchases, i.e., from capital funds, borrowed funds or elsewhere. Because of this, the personnel who make the determination to purchase or sell a security may well take into account in determining their internal cost of holding a security and potential profit (or loss) thereon this internal imputed interest charge, along with other factors relating to the buying, selling or holding of securities. They do not take into account whether the funds used to make purchases or carry the securities were borrowed because, regardless of the source of funds, they are, for internal purposes, subject to this imputed interest charge. Also, as noted previously, consistent with the Company's practices, funds derived from borrowing are not segregated from general funds and become part of such general funds derived from all sources.

## APPENDIX B

### Application of Code Section 265(2) Using Hypothetical Values [1]

| | | |
|---|---|---|
| Total Assets | = | $100,000,000 |
| Tax–Exempt Assets | = | $ 20,000,000 |
| Tax–Exempt Assets Used for Collateral on Indebtedness | = | $ 5,000,000 |
| Taxable Assets | = | $ 50,000,000 |
| Taxable Assets Used for Collateral [2] | = | $ 15,000,000 |
| Portion of Taxable Assets Used for Collateral That Secures Debt Used to Purchase Taxable Assets | = | $ 6,000,000 |
| Total Interest Expense on Indebtedness [3] | = | $ 3,000,000 |
| Interest Expense on Indebtedness Secured by Tax–Exempt Securities | = | $ 750,000 |
| Interest Expense on Indebtedness Secured by Taxable Securities | = | $ 2,250,000 |
| Interest Expense on Indebtedness Secured by Taxable Securities and Used to Purchase Taxable Securities | = | $ 900,000 |

1. The taxpayer in this hypothetical is assumed to be an investment banker or broker/dealer in securities that, like Dillon, Read, (1) uses both taxable and tax-exempt securities as collateral for indebtedness and (2) buys, sells, and holds both taxable and tax-exempt securities in the ordinary course of business. In other words, both direct and circumstantial evidence exists to demonstrate the prohibited purpose.

2. For simplicity's sake, the court will assume that a one-to-one relationship exists between the value of collateral and the amount of indebtedness and that no unsecured debt exists. Thus, a total of $20,000,000 in collateral secures $20,000,000 in indebtedness. Although Dillon, Read had no unsecured debt, a one-to-one relationship between the value of collateral and the amount of indebtedness did not exist.

3. The court will assume that a simple interest rate of 15 percent applies to all of the indebtedness.

A. Computation of Deductible and Nondeductible Interest Expense for a Single Tax Year Using the Hypothetical Values:

Clearly Deductible Interest Expense Based on Direct Evidence That the Indebtedness Was Incurred Or Continued Only to Carry and Purchase Taxable Securities $= \$ \ 900,000$

Clearly Nondeductible Interest Expense Based on Direct Evidence That the Indebtedness Was Incurred or Continued to Carry Tax–Exempt Securities [4] $= \$ \ 750,000$

Application of *Leslie* formula, as described in *E.F. Hutton Group, Inc.* and Rev.Proc. 72–18 § 7.02, to All Remaining Interest Expense:

$$\$1,350,000 \text{ [5]} \ \times \ \frac{\$20,000,000 - \$5,000,000 \text{ [6]}}{\$100,000,000 - \$5,000,000 - \$6,000,000 \text{ [7]}} \ =$$

$$\$1,350,000 \ \times \ 0.16854 = \underline{\$227,528} \quad \begin{array}{l}\text{additional nondeductible}\\ \text{interest expense}\end{array}$$

Total nondeductible interest expense $= \$ \ 750,000 + \$227,528 = \underline{\$ \ 977,528}$

Total deductible interest expense $= \$ \ 900,000 + (\$1,350,000 - \$ \ 227,528) = \underline{\$2,022,472}$

Thus, of the $3,000,000 total interest expense, $977,528 is not deductible and $2,022,472 is deductible.

B. Application of Dillon, Read's Two Alternatives (*see supra* Stipulation at 262) Using the Hypothetical Values:

Alternative 1 (based only on collateralization)
Nondeductible Interest $= \$ \ 750,000$
Deductible Interest $= \$2,250,000$

Alternative 2 (based only on the *Leslie* allocation formula)

Nondeductible interest $=$

$$(\$3,000,000 - \$900,000) \ \times \ \frac{\$ \ 20,000,000}{\$100,000,000 - \$6,000,000}$$

$$= \ \underline{\$ \ \ \ 446,809}$$

---

4. The court assumes here that the taxpayer continued or incurred the indebtedness for the purpose of carrying the collateralized tax-exempt securities and that the exception to the general rule does not apply.

5. This figure, which equals the total interest expense of $3,000,000 less clearly deductible interest ($900,000) and clearly nondeductible interest ($750,000), represents the interest on debt that is secured by taxable securities and that cannot be directly traced to the purchase or carrying of any type of security—i.e., the interest on $9,000,000 of indebtedness ($15,000,000—$6,000,000). Only circumstantial evidence links this remaining indebtedness to the purchase or carrying of tax-exempt securities.

6. The value of the collateralized tax-exempt securities must be subtracted from the fraction to account for the fact that the deduction of interest on the debt secured by these tax-exempts has already been disallowed under the direct evidence rule.

7. Under Rev.Proc. 72–18 § 7.03 and *E.F. Hutton Group, Inc.*, 811 F.2d at 585, the "amount of indebtedness the interest on which is not subject to disallowance" must be subtracted from the denominator. Although Dillon, Read had some indebtedness the interest on which was clearly deductible, *see supra* Stipulation at 258–62 (in appendix A), the IRS did not subtract from the denominator any amount reflecting this debt. Because neither party disputes the IRS' failure to subtract such an amount, *see infra* appendix C, and because no figures were provided in the stipulated facts to enable the court to determine the amount of this indebtedness, the court will not press the issue beyond noting its presence.

Deductible Interest = $ 3,000,000 — $ 456,809 =
 $ 2,553,191

## APPENDIX C

### Application of IRS' Method for Computing Nondeductible Interest (Using Corrected Amount for Tax–Exempt Assets), As Stipulated by the Parties

1974:

| | |
|---|---:|
| Nondeductible interest = | $147,182.00 |
| $543,289 \times \dfrac{\$\ 4,797,500 - 1,547,059}{\$27,842,260 - 1,547,059}$ = | 67,158.00 |
| TOTAL | $214,340.00 |
| IRS' determination of nonded. interest = | (218,505.00) |
| Additional deduction Dillon should be allowed = | $ 4,165.00 |
| Overpayment of tax | $ 1,999.20 |
| Overpayment of assessed interest on overpaid tax | $ 642.13 |
| AMOUNT OF TAX REFUND | $ 2,641.33 |

1975:

| | |
|---|---:|
| Nondeductible interest = | $ 55,721.00 |
| $826,650 \times \dfrac{\$\ 3,590,000 - 352,941}{\$39,542,000 - 352,941}$ | 68,282.00 |
| TOTAL | $124,000.00 |
| IRS' determination of nonded. interest = | (125,027.00) |
| Additional deduction Dillon should be allowed = | $ 1,024.00 |
| Overpayment of tax | $ 491.50 |
| Overpayment of assessed interest on overpaid tax | $ 119.13 |
| AMOUNT OF TAX REFUND | $ 610.63 |

1976:

| | |
|---|---:|
| Nondeductible interest = | $ 38,341.00 |
| $2,289,292 \times \dfrac{\$\ 3,782,080 - 746,079 - 679,731 \ *}{\$102,280,308 - 746,079}$ = | 53,127.00 |
| TOTAL | $ 91,468.00 |
| IRS' determination of nonded. interest = | ( 93,925.00) |
| Additional deduction Dillon should be allowed = | $ 2,457.00 |
| Overpayment of tax | $ 1,177.00 |
| Overpayment of assessed interest on overpaid tax | $ 245.53 |
| AMOUNT OF TAX REFUND | $ 1,422.53 |

1977:

| | |
|---|---:|
| Nondeductible interest = | $302,063.00 |
| $5,291,214 \times \dfrac{\$\ 6,457,529 - 5,118,824 - 19,224 \ *}{\$151,733,186 - 5,118,824}$ = | 47,619.00 |
| TOTAL | $349,682.00 |
| IRS' determination of nonded. interest = | (377,000.00) |

* This number represents the "fails to receive less fails to deliver." *See* Stipulation at 259 n. 1 (in appendix A). Both parties agree that the IRS properly subtracted this figure from the numerator.

Additional deduction Dillon should be allowed = $ 27,318.00

| | |
|---|---|
| Overpayment of tax | $ 13,113.00 |
| Overpayment of assessed interest on overpaid tax | $ 1,815.67 |
| AMOUNT OF TAX REFUND | $ 14,928.67 |